136, 62 N. E. 149, Atwater v. Trustees, etc., 124 N. Y. 602, 27 N. E. 385, Benner v. A. D. Co., 134 N. Y. 156, 31 N. E. 328, 17 L. R. A. 220, 30 Am. St. Rep. 649, and Booth v. R., W. & O. T. R. R. Co., 140 N. Y. 267, 35 N. E. 592, 24 L. R. A. 105, 37 Am. St. Rep. 552, where it is held that in the absence of negligence there is no liability for consequential damages incidentally resulting from the vibrations of the earth or air caused by the construction of a lawful improvement either in a public street or upon private property. The clause of the permit with respect to underground improvements was designed for the protection of those directly encountered in the progress of the work.

It follows, therefore, that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event.

PATTERSON, P. J., and LAMBERT, J., concur.

McLAUGHLIN, J. (dissenting). I am unable to concur in the opinion of Mr. Justice LAUGHLIN. I think the judgment should be affirmed, for the reasons stated in the opinion of the learned referee. No other rule is practicable in a great city, where the streets are full of pipes laid by various public service corporations, and it is unwise to lay down the rule that, in order to recover for injury thereto, negligence in interfering with them must be shown.

I therefore vote to affirm the judgment.

HOUGHTON, J., concurs.

---

(123 App. Div. 339.)

ROBINSON v. NEW YORK & P. C. R. CO. et al.

(Supreme Court, Appellate Division, First Department. January 10, 1908.)

1. CORPORATIONS—ACTS OF DIRECTORS—INTERFERENCE OF COURTS.

A court of equity will interfere, at the suit of a minority stockholder, to prevent proposed action by the directors elected by and representing the majority stockholders, where the proposed action is so detrimental to the interests of the corporation itself as to lead to the inference that the interests of the majority are outside of and in opposition to the interests of the corporation and the minority stockholders, and the consummation of the scheme would constitute a wanton or fraudulent destruction of the rights of the minority stockholders.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 668, 1426.]

2. SAME—RAILROADS—CONSOLIDATION CONTRACT—VALIDITY.

The W. Railroad Company, having a charter to construct a railroad between certain termini, notwithstanding its charter had been questioned, had expended $1,700,000 in the acquisition of its right of way, etc., and had contracted for the construction and completion of its road in consideration of the issuance of bonds of the par value of $15,000,000 and stock of the par value of $19,000,000, subscribed for by an underwriting syndicate. The P. Railroad Company was organized for the construction of a road between the same termini, and, being controlled by the same persons who owned a controlling interest in the W. Company, proposed that the two should enter into a contract by which the W. Company should transfer its construction contract, so far as it concerned the portion of the line south of the New York City line, together with all its construction work on that portion of its line under the contract, and convey all its

real estate, etc., along that portion of its line to the P. Company, in con-
sideration of which the latter agreed to change its route so as to use that
laid out by the W. Company and complete the construction over the coin-
cident route, the cost of which was said to be about $5,000,000, and that
the two companies should thereafter have equal rights to use such por-
tion of the road; each paying an equal share of expenses of maintenance
and administration. *Held*, that the effect of such contract would be to
indefinitely postpone the completion of the remaining portion of the W.
Company's road, and, as it operated to transfer practically all that com-
pany's property for no substantial consideration, a preliminary injunc-
tion restraining the execution of the contract pendente lite was properly
granted at the instance of one of the W. Company's dissenting stock-
holders.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§
668, 1426.]

3. APPEAL—INJUNCTION—JURISDICTION.

Where, on appeal from an order granting a preliminary injunction in
a suit by a dissenting stockholder of a railroad company to restrain the
execution of a contract by which the property of the corporation was to be
transferred to another corporation for no substantial consideration, the
case presented was complicated, the court would not consider an offer of
the purchasing company to furnish other considerations for the property
than those specified in the contract.

Patterson, P. J., and Ingraham, J., dissenting.

Appeal from Special Term.

Action by Robert E. Robinson against the New York & Port Ches-
ter Railroad Company, impleaded with others. From an order grant-
ing a temporary injunction (55 Misc. Rep. 516, 105 N. Y. Supp. 897),
defendants appeal. Affirmed.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGH-
LIN, CLARKE and SCOTT, JJ.

Francis Lynde Stetson, for appellants Perry, Thorne, and Mill-
brook Co.

George S. Graham for appellant New York, Westchester & Boston
Ry. Co.

William C. Trull, for appellant New York & Port Chester R. Co.

Lewis L. Delafield (J. H. Caldwell and Robert R. Reed, on the brief),
for respondent.

SCOTT, J. The purpose of the injunction now appealed from is
to restrain until the trial of the action the execution of a proposed
contract between the New York, Westchester & Boston Railway Com-
pany, and the New York & Port Chester Railroad Company, whereby
the former company (hereinafter termed the "Westchester Company")
is to transfer to the latter company (hereinafter termed the "Port Ches-
ter Company") certain valuable properties, and is to consent to the
relocation of a portion of the route of the Port Chester Company, so
as to coincide with a portion of the route of the Westchester Company,
upon the construction and acquisition of which the latter company
has expended nearly $2,000,000. The defendant Millbrook Company,
controlled and substantially owned by the defendants Thorne and
Perry, owns all of the capital stock of the Port Chester Company and
a majority of the capital stock of the Westchester Company; the
plaintiff being a minority stockholder of the latter company, but own-
ing no interest in the Port Chester Company. The plaintiff sues as

well for himself as for other stockholders of the Westchester Company similarly situated. The gravamen of his complaint is that the proposed contract is opposed to the true interests of the Westchester Company, and is unjust, oppressive, and unfair to its stockholders, or at least to such of them as are not stockholders in the Port Chester Company.

The conditions which must exist in order to justify the interposition of the court in a case of this nature have been well stated by Mr. Justice INGRAHAM. I quite agree with him that the court should not interpose in a dispute between the majority and minority stockholders in relation to the ordinary control and management of its corporate affairs, or substitute its judgment as to the proper management and control of the corporation for that of the directors elected by and representing the majority stockholders. It is the duty of the court, however, to interfere, if called upon, when the proposed action of the majority is so detrimental to the interests of the corporation itself as to lead to the necessary inference that the interests of the majority of the shareholders lie wholly outside of and in opposition to the interests of the corporation and of a minority of the shareholders and its consummation would be a wanton or fraudulent destruction of the rights of the minority stockholders. Gamble v. Queens County Water Co., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527. If the agreement proposed to be executed between the Westchester Company and the Port Chester Company is of the character above described, the temporary injunction was rightly granted and should be continued. To determine whether the proposed agreement is of such a character, it is necessary to briefly consider the relative situation of the two companies, the terms of the proposed agreement, and the consideration to be given to the Westchester Company. That company holds a charter, the validity of which has been questioned, although it has never been authoritatively adjudged invalid, and, even if defective or doubtful, does not appear to be necessarily beyond legislative cure. We do not consider that we should, upon such an appeal as this, undertake to pass upon the validity of the charter pro or con, merely recognizing, as one of the important facts in the case, that a question as to such validity has been raised and remains undetermined.

The charter of the Port Chester Company appears to be free from any cloud of doubt as to its validity. It is not unnatural or unreasonable that those who control both companies and own all the stock of one and a majority of the stock of the other, and who contemplate building only one road, should desire to so merge the interests of the two companies as to build under the unimpeached charter, and at the same time to reap the benefit of what has already been done by the company whose charter rights rest under a cloud; and if this is fairly done, with due regard to the rights and interests of all parties concerned, it would be difficult to find legal objection thereto. The Port Chester Company has thus far expended no money and done no work towards the construction of the road. The Westchester Company has expended upwards of $1,700,000 in constructing a part of its line within the city of New York and acquiring by purchase rights of way. It has entered into a contract for the construction of its road, for which

it has issued and delivered bonds of the par value of $15,000,000 and stock of the par value of $19,000,000. This contract, in turn, is secured by an underwriting syndicate, the participants in which have agreed to take the bonds and a portion of the stock and in consideration thereof to provide the necessary funds for the construction and completion of the road between 177th street in the city of New York and the village of Port Chester. The proposed agreement, the execution of which it is now sought to enjoin, contemplates that the route of the Port Chester Company shall, by appropriate action of the board of estimate and apportionment, be so altered as to coincide, between 177th street and the city line, with the route already laid out and appropriated to the Westchester Company, that being the portion of its route upon which that company has expended the amount of money already referred to; that the Westchester Company shall assign to the Port Chester Company all of its right, title, and interest in the contract for the construction of its road so far as concerns the portion of its line south of the city line, and also all of its construction work, rails, tools, engines, bridges, tunnels, and other property which it now owns or to which it may hereafter become entitled under said contract in and along the portion of its line above mentioned and that portion of its branch line from Gildersleeve avenue to Barrett's creek, and also to make good and sufficient deeds to the Port Chester Company of any and all real estate owned by it along its line between said points, as well as any and all contracts for the construction of such portions of its railroad. In other words, the Westchester Company is to turn over to the Port Chester Company, not only a vital and essential section of its route, but also tangible property which has cost it nearly $2,000,000, and a construction contract in consideration of which it has issued and delivered nearly its whole authorized issue of bonds and a large proportion of its authorized issue of stock. It would therefore stand, upon the consummation of the agreement, effectually denuded of everything of value which it now possesses, except a charter of questioned validity. In return the Port Chester Company agrees to complete the construction of so much of the lines as shall, after the relocation of its route, be common to both companies, and it is said that to so complete the construction of the road over the coincident route will cost about $5,000,000. Although it is not so stated in express terms, it may be assumed that this work is to be completed under the contract to be assigned by the Westchester Company to the Port Chester Company, and which is backed by the Syndicate agreement secured by the securities issued by the Westchester Company. The consideration to be given to the Westchester Company for thus parting with all of its property and contract and property rights is that when the line is completed over the coincident portions of the routes "each of said roads shall have equal right to operate trains over and upon the said line of road upon a schedule to be hereafter agreed upon," all expenses of maintaining said common line and of the administration thereof to be borne equally by the two companies.

It is argued with great insistence that this agreement is eminently fair, inasmuch as the Westchester Company is to be admitted to an equal partnership in the use of a section of the line upon which it will

have expended only $1,700,000, while the Port Chester Company will have expended some $5,000,000. It appears to us that this argument is fallacious, and that the proposed consideration to be given to the Westchester Company is entirely illusory and unsubstantial. It is quite apparent that the Westchester Company can derive no benefit from the privilege to use the coincident portion of the route unless and until it shall be able to complete its whole route. One of the reasons given by defendants for wishing to make the proposed agreement is that the territory to be served will not support or justify the building of two roads, and that fact, taken with the other fact that the Westchester Company has issued nearly all of its authorized bonds and stock as consideration for the contract it is about to assign, renders it perfectly clear that if the proposed agreement is consummated the completion of its road by the Westchester Company will be indefinitely and probably permanently postponed. Hence the net result of the proposed agreement would be that in return for this assignment of all its property, representing at least a cash outlay of $1,700,000 the Westchester Company is to receive only a privilege of which it can never avail itself. Two facts appear to me to stand out as established beyond contradiction: First, that the proposed contract, if carried out will effectually prevent the Westchester Company from carrying out the purposes of its incorporation; and, second, that in any aspect of the case the Westchester Company is to part with property representing an expenditure of $1,700,000, for which no substantial consideration is to be given. Even if the charter of the Westchester Company should hereafter be held to be invalid, so that it could not proceed with the construction of its road, it would not thereby forfeit the tangible property which it had already acquired and for which it had expended its money. I cannot see how it can be said that such a contract is not detrimental to and destructive of the rights of the Westchester Company itself, and unjust, oppressive, and unfair to those stockholders of the Westchester Company who are not also stockholders in the Port Chester Company.

The counsel for the appellants, apparently recognizing the very obvious inadequacy and unfairness to the Westchester Company of the agreement as now proposed, offered in the court below, and renewed the offer upon the argument in this court, to stipulate that the proposed contract should be so amended, by an order to be entered herein, as to provide as an alternative to the right of equal use a provision that the Westchester Company should receive one-half of the net profits derived from the use of the common route, after deducting certain expenses and charges, or at its option should receive a sum in cash equal to one-half of the equity of the Westchester Company in the common line. I do not consider that, upon an appeal from an order granting an injunction pendente lite in so complicated a case as the present, this court should undertake to make a contract for the parties, or attempt to say what modification of the contract now proposed would be fair and reasonable. If that is to be done by the court at all, it should be at Special Term, where all parties can be heard and all relevant facts laid before the court. Nor do I think that the temporary injunction should be dissolved, and the parties left free

to carry out the proposed contract, in reliance upon the power and authority of the court upon the trial to compel its modification. All we have to deal with at the present is the contract as now proposed, and if we find it to be unfair, unjust, and unreasonable, as I believe it to be, we should not hesitate to prevent its consummation until the cause can be brought to trial. If it then appears that the defendants propose and are willing to enter into a fair, just, and reasonable contract, the court will be able to mold its decree according to the facts as they then appear.

So far as the order appealed from restrains the board of estimate and apportionment, that board has not appealed and is not aggrieved by the injunction. It is unnecessary to consider how far it would have the right, without the consent of the Westchester Company, to consent to the occupation by another of the route already assigned to it; for there is no reason to suppose that it would take such action while the Westchester Company was enjoined from giving such consent. As the case presents itself to me, great wrong and harm may be done to the minority stockholders of the Westchester Company if the proposed agreement is permitted to be consummated before the trial of the action, while little or no harm can result to the defendants if the injunction be continued until a trial can be had. At the most they will be subjected to only a slight delay in carrying out their plans for a consolidation of interests, and perhaps to adopt a fair and just plan in place of one that now appears to be unfair and unjust.

The order appealed from should be affirmed, with $10 costs and disbursements.

LAUGHLIN and CLARKE, JJ., concur.

INGRAHAM, J. (dissenting). The plaintiff, as a stockholder of the defendant the New York, Westchester & Boston Railway Company, seeks to have the board of estimate and apportionment of the city of New York enjoined from granting an application made by the defendant the New York & Port Chester Railroad Company for a change of the routes of that company, so far as the substituted routes are the same or substantially the same as the routes covered by the franchise granted to the New York & Westchester Railway Company; the defendant the New York & Port Chester Railroad Company enjoined from continuing an application for a change of routes; and the defendant the New York, Westchester & Boston Railway Company enjoined from entering into a proposed contract with the New York & Port Chester Railroad Company, or any other company, wherein and whereby the assent of the said Westchester Company to the said change of routes shall be given, or wherein and whereby said Westchester Company shall assign and convey its right, title, and interest, or any part thereof, in and to a certain contract made with one Charles H. Smith, or shall assign or convey any of its property or real estate or right of way in or along said second substituted route to the defendant the New York & Port Chester Railroad Company; and for such other and further relief as may be just and equitable.

The complaint alleges that the defendant the Westchester Com-

pany is a corporation organized under the general railroad law for the purpose of building and operating a railroad from a point at or near Port Morris, on the Harlem river, borough of the Bronx, city of New York, to the village of Port Chester, Westchester county, and certain branch lines; that the defendant the Port Chester Company, is a domestic corporation organized under the general railroad law for the purpose of building and operating a railroad from a point at or near the Harlem river to the village of Port Chester, with certain branch lines, the main line of which is parallel with that of the Westchester Company; that the Millbrook Company is a corporation organized for the purpose of acquiring and owning the stock and bonds of the Westchester Company and the Port Chester Company, and now owns all of the stock of the Port Chester Company and a majority of the stock of the Westchester Company; that the defendant the Westchester Company was granted a franchise by ordinance of the board of aldermen of the city of New York, approved by the mayor on August 2, 1904, to construct and operate a four-track railroad over so much of its route as lies within the city of New York upon and across certain named avenues and highways, which franchise was accepted by the Westchester Company, and it has complied with the terms and conditions of the said ordinance; that the capital stock of the said Westchester Company is $20,000,000, and it was authorized to issue $20,000,000 in bonds, secured by a mortgage upon its franchise and property; that thereafter it entered into a contract with one Charles H. Smith, dated April 25, 1904, whereby Smith agreed to construct and equip that part of the railroad company's line located between 177th street, in the city of New York, and the village of Port Chester, and acquire all rights of way, rolling stock, and other appliances and property necessary for the complete equipment and operation of the said road in consideration of its bonds, secured by a mortgage to the amount of $15,000,000 and $19,000,000 par value of its capital stock; that Smith assigned such contract to the City & County Contract Company, a corporation organized for the purpose of building and equipping said road, and by an agreement between Dick and Robinson and the City & County Contract Company a syndicate was organized for the purchase of $15,000,000 par value bonds and $4,500,000 par value of said stock for the purpose of providing necessary funds to enable the City & County Contract Company to complete its contract and construct the said road; that under said contract it was provided that for each subscription of $900 the subscriber was entitled to receive a first mortgage bond of the par value of $1,000 and $300 par value of stock of the Westchester Company; that this syndicate agreement expired on the 12th of May, 1907; that by an agreement in writing, dated the 8th day of December, 1904, the stockholders of the Westchester Company assigned and transferred to certain trustees all their stock in the Westchester Company, to be held by the trustees until the expiration of one year after the completion of the road of the Westchester Company, the said trust not to continue after the 15th of July, 1909, with authority to said trustees to vote on all of said stock so transferred to them at any and all meetings of the stockholders of the Westchester Company and at all elections of directors during said

108 N.Y.S.—7

time; that on the termination of the said trust the voting trustees should assign and transfer to the holders of trust voting certificates, issued on deposit of said stock, the amount of stock to which each holder thereof was entitled; that in the month of October, 1906, the City & County Contract Company was indebted to two certain trust companies in the sum of $300,000; that on the 26th day of October, 1906, the City & County Contract Company entered into a written agreement whereby the presidents of these trust companies agreed to supply the place of all underwriters of said syndicate agreement not satisfactory to the syndicate managers with good and satisfactory underwriters, so that the said subscriptions should aggregate the total amount of $15,000,000 at par, to the end that the funds would be provided for building the road of the Westchester Company; that thereby Perry and Thorne, the presidents of these two trust companies, purchased from the stockholders of the City & County Contract Company the stock of the City & County Contract Company, and the City & County Contract Company transferred and assigned to Perry and Thorne all their right, title, and interest in and to the stock of the Westchester Company then owned by the City & County Contract Company, of the par value of $10,325,000, and thereby Perry and Thorne subscribed to the syndicate agreement to the amount of $9,158,700 and obligated themselves to pay that amount according to the terms of said syndicate agreement for the account of the City & County Contract Company, to be used for the construction of the said road of the Westchester Company; that thereby Perry and Thorne became the owners of a majority of the stock of the Westchester Company, and thus became the owners of a controlling interest in the stock of the Port Chester and Westchester Companies; that the defendants Perry and Thorne had not paid the amount due on their own subscription to the underwriting agreement, or the amount due on the subscriptions assigned to them, or any part thereof; that in the month of November, 1906, the defendants Perry and Thorne organized the defendant Millbrook Company for the purpose of taking over the stock and securities of the Westchester Company, the Port Chester Company, and the City & County Contract Company; that the defendants Perry and Thorne, after they acquired control of these various corporations, caused the City & County Contract Company to stop all work on the construction of the road of the Westchester Company, and no construction work on said road has since been done; that on the 4th of April, 1907, the Port Chester Company made application to the board of estimate and apportionment of the city of New York for the right to change the line of parts of its proposed railway in the borough of the Bronx, city of New York, and that this change of route in some respects is identical with the route or line for which a franchise was granted by the board of aldermen of the city of New York to the Westchester Company, and that, should the board of estimate and apportionment grant the application of the Port Chester Company, the result will be that the city will have granted two franchises for railroads of similar construction upon the same route, and that said application was pending before the board of estimate and apportionment, action thereon having been adjourned to June 21, 1907; that the Port Chester and West-

chester Companies were about to enter into a contract in which it would be agreed that the Port Chester Company will build its railroad on so much of the route as is common to both companies, and that both companies will have equal rights to operate trains over such lines upon a schedule to be mutually agreed upon by them and in which the Westchester Company assigned to the Port Chester Company all its right, title, and interest in and to the construction contract between it and Charles H. Smith, and thereafter assigned to the City & County Contract Company, for the construction of that portion of the main line of its railroad between 177th street and the Port Chester terminus; that the Westchester Company also assigns and transfers to the Port Chester Company all the construction work, rails, tools, engines, bridges, tunnels, and other property now owned by the Westchester Company, or to which it may hereafter become entitled under and by virtue of the said agreement with the said Smith in and along that portion of its line from the southeasterly corner of the Bronx Park to the northern boundary line of the city of New York; that it is not the purpose or intention of the defendants Perry and Thorne, who own and control or substantially all the stock of the Millbrook Company, to build or cause to be built both the Westchester Company's road and the Port Chester Company's road, but it is their purpose and intention to construct the road of the Port Chester Company only; that the execution of the said proposed contract has never been authorized by a vote of a majority of the stockholders of the Westchester Company, and, if it had been authorized or assented to by a majority of the said stockholders, said authorization and consent was obtained by reason of the control exercised by said Perry and Thorne over the voting trustees of the Westchester Company; that the length of the Westchester Company's main line in process of construction between 177th street and the northern boundary of the city is approximately 23,000 feet, and is entirely over private right of way except at street crossings; that about 13,000 feet has been completed, and the Westchester Company has expended thereon, exclusive of amounts expended for right of way, upwards of $1,077,000, and expended upwards of $700,000 in the purchase of right of way between said points; that the franchise granted to the Westchester Company is necessarily exclusive; that the defendants Perry and Thorne are in full and complete control of the defendant Westchester Company and of the majority of its board of directors; and that the action was commenced and prosecuted by the plaintiff on his own behalf and for the benefit of all the other stockholders of the Westchester Company similarly situated.

There are two railroad corporations who claim to have franchises to build railroads through the same territory in the city of New York. The validity of the franchise of one of the said corporations, the Westchester Company, was questioned. It does not appear that the franchise of the Port Chester Company is open to question. The persons who were the beneficial owners of a large majority of the stock of the Westchester Company had acquired the stock of the Port Chester Company, and it was then proposed to substantially unite the two companies, so that there should be but one line of railroad constructed within the city of New York which could be used by both companies,

and to accomplish that result an application was made to the board of estimate and apportionment to change the route of the Port Chester Company so that it would substantially coincide with the route of the Westchester Company, and a contract was to be entered into between the two companies and the work completed in accordance therewith. A minority stockholder, claiming that this arrangement will in some way injure the Westchester Railway and his rights as a stockholder, brings this action to enjoin the carrying out of this plan. The learned judge at Special Term granted this injunction upon the ground that the delay in the action by the board of estimate and apportionment can hardly, if at all, harm the defendant, but, should the board grant the application and the proposed contract be executed, irreparable loss would follow to the plaintiff, even should he succeed at the trial; and therefore an injunction was granted which restrains the board of estimate and apportionment from granting an application to change the route of the Port Chester Company upon an application commenced by a stockholder of the Westchester Company.

I do not think that the power of the board of estimate and apportionment to grant the application of the Port Chester Company can be questioned. That the grant of any railroad company franchise may affect a road with which it would compete is, in the absence of an exclusive grant, a legal objection to the granting of a franchise to a competing road, and I know of no authority in the Supreme Court to restrain the Port Chester Railroad Company from obtaining by a change of its route a line of railway which will compete with the Westchester Company, or the board of estimate and apportionment from granting it. By the ordinance of the city of New York the Westchester Company acquired no exclusive right to the route granted, for in the ordinance granting the privilege to construct this road it was provided by section 4 that:

"The grant of this privilege shall not affect in any way the right of the city of New York to grant a similar privilege upon the same or other terms and conditions to any other person or corporation."

The Port Chester Company, therefore, had a right to apply for a change of routes, and the board of estimate and apportionment had power to entertain that application, and there was nothing to justify the court in enjoining the Port Chester Company from applying for the change of routes, or the board of estimate and apportionment from granting such application. The injunction granted, however, further enjoins the defendant the Westchester Company and Perry and Thorne from consenting or permitting, or agreeing in any way to consent or permit, or to effect, or to attempt to effect, either directly or indirectly, the change of route hereinabove mentioned and forbidden, or any part thereof, or to assign, convey, or give, or to agree in any manner to assign, convey, or give, directly or indirectly, unto the said New York & Port Chester Railroad Company, the use of or right to use the said route of the New York, Westchester & Boston Railway Company, or any part thereof, or any of the property, real or personal, contracts, or choses in action of the said New York, Westchester & Boston Railway Company.

The action was brought by a minority stockholder of the Westchester Company to control the actions of the majority in relation to a contract which the corporation was by law authorized to make. The Westchester Company, in the construction of its road, had been met with an objection to its franchise to construct the road. It is not necessary or proper that we should attempt upon this application to determine whether that objection was or was not well taken; but it is perfectly apparent from the papers that the objection was a serious one, and might result in a determination which would imperil the franchise of the Westchester Company, and subject it to the loss of a large portion of the money that had been expended in the construction of the road. There was the franchise of the Port Chester Railroad Company in existence, as to which no substantial objection had been made, and those interested in the Westchester Company acquired the capital stock of the corporation owning that franchise. It was then proposed that the two companies should make a contract by which the Port Chester Railroad Company should construct an important section of the road upon the route covered by the franchise of the Westchester Company under an arrangement by which both companies should use the road thus constructed. The total amount that had been expended by the Westchester Company in the construction of the road, including the purchase of the right of way, was approximately $1,700,000, while it would cost upwards of $5,000,000 to complete the construction and equipment of the railroad upon that portion of the route that is affected by this controversy. The apparent result would be that the Westchester Company would acquire the right to use a completed railroad which would cost in the neighborhood of $7,000,000 at an expenditure of about $1,700,000, and would also avoid the obligation of having to defend its franchise and be relieved from the risk of having such franchise destroyed. Certainly, under such circumstances, the execution of such a contract is not a breach of trust or such assertion of power by the majority stockholders of a corporation as justifies a court of equity in granting a temporary injunction from proceeding with the execution of the contract. It is only to a very limited extent, if at all, that the majority of the stockholders of a corporation can be said to be the trustees for the minority stockholders.

While the power of a court of equity to restrain the majority stockholders of a corporation at the suit of a minority from doing an act which would in effect destroy the corporation, or prevent it from carrying out the objects for which it was incorporated, or from misappropriating or wasting its assets or property, is well settled, the general power of a court to grant such relief is based upon some illegal or unauthorized act of the majority which tends to destroy or injure the corporation. The court should not interpose in a dispute between the majority and minority stockholders in relation to control and management of the corporate affairs, and substitute its judgment as to the proper management and control of the corporation for that of the majority stockholders. It seems to me that in such a case, to justify the interposition of a court of equity, there must appear to be some illegal or unauthorized action of the majority which would directly tend to injure the corporation or destroy its franchise, or waste and

misapply its property. We must bear in mind that it is not the right of the corporation to question the acts of its directors that is involved, but the right of a minority stockholder as against the majority of the stockholders. It is quite unnecessary upon this application to determine just what situation would justify the interference by the court at the request of a minority stockholder, but it is evident that the rule which is applied between principal and agent and trustee or cestui que trust is not at all applicable.

In Gamble v. Queens County Water Company, 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527, the question is quite fully discussed, and Judge Peckham, in delivering the opinion of the court, says:

"A shareholder has a legal right, at a meeting of the shareholders, to vote upon a measure, even though he has a personal interest therein separate from other shareholders. In such a meeting each shareholder represents himself and his own interests solely, and he in no sense acts as a trustee or representative of others. The law of self-interest has at such time very great and proper sway. * * * Their action resulting from such votes must not be so detrimental to the interests of the corporation itself as to lead to the necessary inference that the interests of the majority of the shareholders lie wholly outside of and in opposition to the interests of the corporation and of the minority of the shareholders, and that their action is a wanton or fraudulent destruction of the rights of such minority."

The court then cited with approval the case of N. W. T. Co. v. Beatty, L. R. 12 App. Cas. 589, in which case it was said that a resolution of a majority of the shareholders upon any question with which the company was competent to deal was valid and binding upon the minority. A voidable contract, it was also said, might be ratified or affirmed by a majority of shareholders at a proper meeting, provided that such ratification was not brought about by improper means and the contract itself was not fraudulent or oppressive towards the minorit. The court also cited Baggallay, L. J., who said that great confusion would be introduced into the affairs of joint-stock companies if the circumstances of shareholders acting in that character in general meeting were to be examined and their votes practically nullified, if they also stood in some fiduciary relation to the company. The ground upon which the court will interfere upon application of a minority stockholder is then stated as follows:

"I think that where the action of the majority is plainly a fraud upon, or, in other words, is really oppressive to, the minority shareholders, and the directors or trustees have acted with and formed part of the majority, an action may be sustained by one of the minority shareholders, suing in his own behalf and in that of all others coming in, etc., to enjoin the action contemplated, and in which action the corporation should be made a party defendant. It is not, however, every question of mere administration or of policy in which there is a difference of opinion among the shareholders that enables the minority to claim that the action of the majority is oppressive, and which justifies the minority in coming to a court of equity to obtain relief. Generally the rule must be that in such cases the will of the majority shall govern. The court would not be justified in interfering, even in doubtful cases, where the action of the majority might be susceptible of different constructions. To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference

that no one thus acting could have been influenced by any honest desire to se-
·cure such interests, but that· he must have acted with an intent to subserve
·some outside purpose, regardless of the consequences to the company, and
in a manner inconsistent with its interests. Otherwise the court might be
·called upon to balance probabilities of profitable results to arise from the
.carrying out of the one or the other of different plans proposed by or on be-
half of different shareholders in a corporation, and to decree the. adoption of
·that line of policy which seemed to it to promise the .best results, or at least
to enjoin the carrying out of the opposite policy. This is no business for any
·court to follow."

And in Farmers' L. & T. Co. v. N. Y. & N. R. Co., 150 N. Y. 410,
44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689, this çase is cited
and the principle there established was not questioned · The judg-
·ment in that case, which was an action to foreclose a mortgage, was
reyersed because the court had refused to find material facts upon the
ground that they were immaterial, and facts which were material and
·established by uncontradicted evidence, and in rejecting as immaterial
·evidence offered by the defendants.

There can be no question, I think, but that by section 15 of the
railroad law (chapter 565, p. 1089, of the Laws of 1890) the corpora-
·tion was authorized to make the proposed contract, and the two com-
panies, therefore, had a right to make such a contract. In the making
·of such a contract, as in the performance of the other business of the
corporation, except as otherwise expressly prescribed by law, the di-
·rectors elected by a majority of the stockholders are authorized to act
for the corporation. In Beveridge v. N. Y. Elevated R. R. Co., 112
N. Y. 1, 19 N. E. 489, 2 L. R. A. 648, it was expressly held that power
·to make such a contract—

·"it is to be exercised as any other power of a corporation is, where the mode
·of exercise is not prescribed by the charter or general laws applicable there-
·to. All powers directly conferred by statute, or impliedly granted, of neces-
·sity must be exercised by the directors, who are constituted by the law as the
.agency for the doing of corporate acts. * * * Within the chartered au-
thority they have the fullest power to regulate the concerns of a corporation
·according to, their best judgment, and contracts which the corporation could
legitimately make come within the scope of the ordinary powers of corporate
·management. * * * The question of the exercise of such a power of man-
agement must be left to the honest and fair business discretion of the board
of directors, and the only inquiry by the stockholders could be as to whether
·there was any fraud by which assets were wrongfully diverted."

Coming down, then, to the real question presented, which is, did it
.appear that the proposed action "is so far opposed to the true inter-
ests of the corporation itself as to lead to the clear inference that no
one thus acting could have ·been influenced by any honest desire to se-
·cure such interests, but that he must have acted with an intent to sub-
·serve some outside purpose, regardless of the consequences to the com-
pany and in a manner inconsistent with its interests" (Gamble v.
·Queens Co. Water Co., supra)? it seems to me that the facts estab-
lished entirely fail to prove such a situation, and that the court at
Special Term was not, therefore, justified in granting this temporary
:injunction.

There. is nothing in the record before us to justify the conclusion
·that the majority stockholders of the Westchester Company are acting
.in bad faith or with intent to despoil the minority stockholders, unless,

indeed, fraud is always, instead of never, to be presumed. The situation was marked and serious. The apprehended invalidity of the Westchester Company franchise, and the consequent inability of that company to proceed with the project of building a road, was not an imaginary situation furnishing a pretext for the action contemplated by the majority stockholders. It was a real and grave situation. The proposed contract, if the charter of the Westchester Company is valid, is one which seemingly in all the circumstances disclosed in the record would appear to be beneficial to the Westchester Company. Confined as it is to a short section of a common route, the Westchester Company would receive, by contributing property costing $1,800,000, a right to the joint use of a portion of a line requiring an expenditure by the Port Chester Company of about $5,000,000. The contract, if the Westchester Company franchise is valid, does not prevent the building of other parts of the Westchester road not embraced within it; nor is the Westchester Company deprived of what it now relies upon as the means with which to build remaining portions of its road. The obligation of Perry and Thorne to the extent of $9,000,000 subscriptions to stock of the Westchester Company still remains, and there is nothing which would indicate that they could in any way be released from performance of that obligation; and the contract for building the road is only assigned to the Port Chester Company in so far as that contract relates to that portion of the road which it is contemplated should be jointly operated by both companies. If the charter of the Westchester Company is invalid, and there remains only a de facto corporation possessed of property, then it would appear, as the case is now presented, that the Westchester Company would have $1,500,000 in Westchester county not affected by the contract, and a one-half interest in the equity of a railroad costing $6,800,000, subject to the existing mortgage made by the Westchester Company. In either situation, therefore, we cannot assume that the proposed contract should at this stage of the proceedings be deemed to be so unfair and destructive of the interests of the minority stockholders of the Westchester Company as to authorize the issuance of an injunction to restrain the board of estimate and apportionment from acting upon the application of the Port Chester Company, or to prevent the formal execution of the contract between the Westchester and the Port Chester companies.

I only desire to add that we do not wish to determine what, if any, relief the plaintiff may be entitled to upon the trial of the action. The court will then have before it all the parties to this contract, and the holders of the majority stock of the two corporations that are interested. It can only protect the plaintiff or the Westchester Company if it should appear that any attempt has been made or is to be made to sacrifice the interests of that company or of its stockholders. The only effect in permitting the contract to be formally executed will be to allow the Port Chester Company to expend its money in the construction of the road upon the route claimed by the Westchester Company, and the court can say at the trial whether or not the contract as formally entered into fully protects the Westchester Company and assures to it the substantial rights to which it is entitled.

We think, therefore, that the order appealed from should be re-

versed, with $10 costs and disbursements, and the motion for an injunction denied, with $10 costs.

PATTERSON, P. J., concurs.