**Claude E. SHELL, Petitioner-Appellant,**

v.

**Milford E. HENSLEY, Respondent-Appellee.**

**Jack E. LOVE, et al., Petitioners-Appellants,**

v.

**Milford E. HENSLEY, et al., Respondents-Appellees.**

**Nos. 27447, 27514.**

United States Court of Appeals, Fifth Circuit.

July 14, 1970.

Alan W. Heldman, Birmingham, Ala., John P. Frank, Phoenix, Ariz., Truman Hobbs, Montgomery, Ala., for petitioners-appellants.

J. Vernon Patrick, Vernon Patrick, Bradley, Arant, Ross & White, Birmingham, Ala., for respondents-appellees.

Before AINSWORTH, DYER and SIMPSON, Circuit Judges.

AINSWORTH, Circuit Judge:

We must here determine, as in the *Herpich* cases [1] decided today, whether minority shareholders, this time of an Alabama corporation, have stated a claim for relief under various sections of the federal securities laws which entitles them to challenge in federal court, absent diversity, the way in which control of their corporation was sold to an Arizona-based complex of insurance companies.

1. Herpich v. Wallace, 5 Cir., 1970, 430 F.2d 792; Herpich v. Wilder, 5 Cir., 1970, 430 F. 2d 818.

The District Court, deciding that this case should be accorded the normal process of factual development and a determination of the real merits of the case, overruled defendants' motions to dismiss the complaint. An important issue with which we deal is the extent to which proof of deception is necessary to show a violation of SEC Rule 10b–5, 17 C.F.R. § 240.10b–5.

These are appeals from interlocutory orders,[2] consolidated by a panel of this Court, which overruled defendants' motions to dismiss the amended complaint filed against them in the court below.[3] Plaintiffs are shareholders of Alabama National Life Insurance Company, an Alabama corporation. They brought suit against Claude E. Shell (appellant in No. 27447), L. E. Cowling, National Securities, Inc. (NSI), Old National Insurance Company, Robert H. Wallace, and Jack E. Love. With the exception of Shell and Cowling, who is not a party to this appeal, defendants are members of the Arizona Group, the principal defendants in Herpich v. Wallace, 5 Cir., 1970, 430 F.2d 792 and appellants in No. 27514 herein. In the present case, the complaint, as amended, alleged violations of section 10(b) of the Exchange Act,[4] Rule 10b–5,[5] section 17(a) of the Securities Act of 1933,[6] 15 U.S.C. § 77q(a), and applicable state law. Plaintiffs sought damages on behalf of Alabama National, themselves, and all Ala-

2. The District Judge, II. H. Grooms, determined that an immediate appeal from his order overruling defendants' motions to dismiss the complaint might materially advance the ultimate termination of this litigation in light of the decisions in Herpich v. Wilder, M.D.Ala., 1969 [Civ.No. 2747–N, January 14], rev'd, 5 Cir., 1970, 430 F.2d 818, and Greenstein v. Paul, 2 Cir., 1968, 400 F.2d 580. *See* 28 U.S.C. § 1292(b) (1964).

3. No. 27514. styled "Love v. Hensley," should not be confused with Hensley v. Love, N.D.Ala., 1969, 298 F.Supp. 698, which is yet another of the Arizona Group cases being tried by Judge Grooms.

4. Section 10 of the Exchange Act, entitled "Regulation of the Use of Manipulative and Deceptive Devices," reads in relevant part as follows:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails. or of any facility of any national securities exchange—
>
> \* \* \* \* \*
>
> "(b) To use or employ, in connection with the purchase or sale of any security \* \* \*, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

5. Rule 10b–5, entitled "Employment of Manipulative and Deceptive Devices," reads as follows:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce. or of the mails. or of any facility of any national securities exchange,
>
> "(1) to employ any device. scheme, or artifice to defraud.
>
> "(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. or
>
> "(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security."

6. Section 17, entitled "Fraudulent Interstate Transactions," reads in part as follows:

> "(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
>
> "(1) to employ any device, scheme, or artifice to defraud, or
>
> "(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. or
>
> "(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

bama National shareholders similarly situated. Federal jurisdiction was predicated upon section 27 of the Exchange Act, 15 U.S.C. § 78aa, and section 22 of the Securities Act, 15 U.S.C. § 77v.[7] Defendants filed motions to dismiss for lack of jurisdiction and for failure to state a claim upon which relief can be granted. The District Judge overruled these motions. He did, however, grant defendants' motion to strike the class-action allegations from the amended complaint. The present status of the suit, consequently, is that of a derivative action brought on behalf of Alabama National under Fed.R.Civ.P. 23.1.

## I.

From the complaint, as amended, affidavits, and documents,[8] the facts, as alleged, appear as follows. Over a four-year period, Alabama National was defrauded in various ways by defendants, who acted in several combinations. Two periods of unlawful activity are presented: (1) 1965 until October 1967, during which time Shell and Cowling used the funds of Alabama or its subsidiary to finance transactions in securities between themselves, corporations they controlled, or both, for the purpose of enriching themselves at the expense of Alabama National; and (2) October 1967 and thereafter, during which time Shell formulated and carried out his agreement with the Arizona Group to sell control of Alabama National to the latter for a premium payable only to him.

### A. 1965–October 1967.

It is alleged that in April 1965, Shell, then the president and a director of Alabama National, and Cowling, who was responsible for the incorporation and initial capitalization of Alabama National, caused the corporation to loan $432,000 to S & S Development Corporation, which Shell controlled. This loan, for which no security, or grossly inadequate security, was given, was made to finance the purchase by Shell or S & S from Cowling of 862,500 shares of stock in Capital Corporation of Texas. At all pertinent times until control of Alabama National was sold to the Arizona Group, both Shell and Cowling were "controlling persons," as that term is defined in the federal securities acts,[9] of Alabama National. Cowling was also a controlling person of Capital Corporation, which in turn, was a controlling person of Alabama National. Capital Corporation held this control position at least partially as a result of its purchase of a substantial block of Alabama National stock from Cowling. Cowling had taken Capital Corporation's note in payment for these shares. In 1967, Bayou Land Corporation, a wholly owned subsidiary

---

7. Plaintiffs also sought to invoke the pendent jurisdiction of the District Court, see, e. g., United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and cited 28 U.S.C. § 1337.

8. After the Court had heard oral argument in this and the related Arizona Group cases decided today, both sides filed supplemental memoranda with the Clerk. Sworn affidavits and attached copies of purported documents were also filed by plaintiffs, who allege that they obtained the information filed as a result of discovery in other Arizona Group cases proceeding in the federal and state courts.

9. The complaint reads in pertinent part as follows:
"7—At all times relevant, prior to January 16, 1968, defendant Claude E. Shell was president, a director, and a 'controlling person' as defined by the federal securities act of defendant Alabama National Life Insurance Company.
"8—Defendant L. E. Cowling was responsible for the founding and initial capitalization of Alabama National Life Insurance Company, Capital National Life Insurance Company of Houston, Texas, and Southern States Life Insurance Company, and on, to-wit, January 16, 1968 and at all times relevant prior thereto was a 'controlling person' as so defined of Alabama National Life Insurance Company and of Capital Corporation of Texas, which in turn owned enough stock of Alabama National Life Insurance Company to control the latter corporation."

of Alabama National, was caused to loan Capital Corporation sums amounting to approximately $267,000 to enable the latter to pay Cowling interest that had accrued on this note. Like the loan from Alabama National to S & S, these advances were not secured by adequate collateral.

## B. October 1967 and Thereafter.

It is further alleged that during October 1967, Shell, Love, and Wallace conspired and agreed that Shell would sell shares of capital stock in Alabama National and Capital Corporation which were registered either in Shell's name or in the names of corporations he owned to NSI for $1,600,000. This price exceeded the market value of the stock and its cost to Shell, and the excess over market value represented a premium payable only to Shell for transferring control of Alabama National. In furtherance and according to the terms of their scheme, Shell and the Arizona Group caused the following to be done: First, Alabama National was, and is being, required to pay part of the premium going to Shell for selling control of Alabama National. This result was, and is being, accomplished in part through the contrivance of a nine-year employment contract granted by the corporation to Shell. This contract calls for Shell to perform part-time work at a salary of $50,000 a year, which is more than he received when employed as the full-time president of the corporation. In addition, Shell and the Arizona Group caused Alabama National to purchase at excessive prices from NSI certain savings-and-loan stock, land, and a note secured by a mortgage; these transactions were effected so that NSI could use the money obtained from Alabama National to pay Shell for the sale of control. Secondly, Shell resigned his positions at Alabama National and used his best efforts to obtain the election of Wallace, Love, and Arizona Group designees as officers and directors of the corporation. Thirdly, Shell was not required to account to Alabama National for the payment received from NSI even

though, as the conspirators knew, Shell had acquired the stock that NSI bought from him with funds he had borrowed from Alabama National while serving as an officer and director of the corporation. Fourthly, Alabama National was caused to assume certain obligations under a reinsurance agreement at no benefit to Alabama National, but to the benefit of the Arizona Group. Fifthly, defendants sent out misleading proxy materials, reports, and other mailings that served to deceive and lull Alabama National and its shareholders other than defendants. These statements included representations that the $50,000 to be paid Shell each year for nine years was for services rather than consideration for the sale of Shell's stock and omitted to disclose the true value of the savings-and-loan stock, land, and note bought by Alabama National from NSI or that Shell had a duty to account to Alabama National. Finally, defendants caused notices of the 1968 annual shareholders' meeting to be mailed so that they were not received by plaintiffs and their class of Alabama National shareholders until the day of the meeting, August 26, 1968.

Defendants characterize the complaint in this case as being in substance a claim of corporate waste or deprivation of corporate opportunity. They concede that this complaint may give rise to a state-law claim of fraud or breach of fiduciary duty, but contend that it may not be asserted in federal court absent diversity of citizenship between the parties. First, it is argued, a claim of violations of section 10(b) and Rule 10b–5 is not stated because "causal deceit" is not alleged. Secondly, and in any event, plaintiffs personally and on behalf of Alabama National lack standing to complain of purported violations of the section and the rule.

For reasons that follow, we conclude that the complaint was sufficient to withstand defendants' motions to dismiss for want of jurisdiction and failure to state a claim upon which relief can be granted. Accordingly, without making any suggestion how this case should be

determined on the merits, *e. g.*, Merlite Land, Sea & Sky, Inc. v. Palm Beach Investment Properties, Inc., 5 Cir., 1970, 426 F.2d 495; Exhibitors Poster Exchange, Inc. v. National Screen Serv. Corp., 5 Cir., 1970, 421 F.2d 1313, we affirm the judgment of the District Court in the appeals numbered 27447 and 27514.

## II.

■ The threshold question we must determine is whether plaintiffs have standing to enforce the violations of section 10(b) and Rule 10b–5 which they allege in their complaint.[10] *See* Herpich v. Wallace, 5 Cir., 1970, 430 F.2d 792. We conclude that plaintiffs, as shareholders of Alabama National, may sue the Arizona Group and Shell derivatively on behalf of Alabama National under the section and the rule.

■■ The individual right of action implied under Rule 10b–5 may be invoked on behalf of a corporation in a shareholder's derivative suit. *E.g.*, Herpich v. Wallace, 5 Cir., 1970, 430 F.2d 792; Rekant v. Desser, 5 Cir., 1970, 425 F.2d 872; City National Bank of Fort Smith v. Vanderboom, 8 Cir., 1970, 422 F.2d 221; Condon v. Richardson, 7 Cir., 1969, 411 F.2d 489; Schoenbaum v. Firstbrook, 2 Cir., 1968, 405 F.2d 215 (en banc). The shareholder who brings a derivative suit under the rule need not

personally be a statutory "purchaser" or "seller." It suffices, for the purpose of establishing standing to sue, that the shareholder allege that his corporation has "purchased" or "sold" securities in connection with some fraudulent activity. Herpich v. Wallace, 5 Cir., 1970, 430 F.2d 792; City National Bank of Fort Smith v. Vanderboom, 8 Cir., 1970, 422 F.2d 221; Surowitz v. Hilton Hotels Corporation, 7 Cir., 1965, 342 F.2d 596, 604, rev'd on other grounds, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966).

The complaint in the present case alleges that Alabama National has been defrauded in connection with its purchase at excessive prices from NSI of, among other things, 219,687 shares of stock in Southwest Savings & Loan Association. In the context of defendants' motions to dismiss the complaint, this allegation, which must be taken as true, Walker Process Equip. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Cliff Food Stores, Inc. v. Kroger, Inc., 5 Cir., 1969, 417 F.2d 203, suffices to give Alabama National, and its shareholders suing derivatively, standing to bring an action under section 10(b) and Rule 10b–5. Herpich v. Wallace, 5 Cir., 1970, 430 F.2d 792; cf. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); Securities Exchange Act of 1934, §§ 3(a) (10), 3(a) (13), 15 U.S.C. §§ 78c(a) (10), 78c(a) (13).[11]

---

10. Violations of section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), are also alleged. In this case, however, we need not reach the question whether an implied right of action should be recognized for violations of section 17(a), since section 10(b) of the Exchange Act and Rule 10b–5 thereunder will support as well as would section 17(a) an action for any monetary or injunctive relief to which plaintiffs or their corporation may be entitled. *See, e. g.*, Globus v. Law Research Service, Inc., 2 Cir., 1969, 418 F.2d 1276, 1283. *See also* 3 and 6 Loss, Securities Regulation 1778–1791 (2d ed. 1961), 3907–3915 (Supp. to 2d ed. 1969). Consequently, we pretermit discussion of section 17(a) in this opinion.

11. Section 3(a) (10) reads as follows:
    "The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency

### III.

The complaint, in addition to declaring that plaintiffs did not discover the wrongs committed by defendants until August 1968, asserts that (1) Alabama National and its shareholders were deceived regarding the true nature of Shell's so-called employment contract, (2) Shell's duty to account to Alabama National was not disclosed in proxy and other mailings, and (3) the true value of the securities and land purchased by Alabama National from NSI was concealed. Defendants contend that the complaint fails to state a cause of action under section 10(b) and Rule 10b–5 because it does not allege facts amounting to "deception" of Alabama National in connection with purchases of securities by Alabama National. Plaintiffs respond that deception is adequately alleged and that, in any event, proof of deception is not required in an action brought under subsections (1) and (3) of Rule 10b–5. We are thus called upon to consider the extent to which proof of deception must be shown in order to establish a cause of action under the section and the rule. In deciding this case, we are mindful that we venture into an area of law where "glib generalizations and unthinking abstractions are major occupational hazards," SEC v. National Securities, 393 U.S. 453, 465, 89 S.Ct. 564, 571, 21 L.Ed.2d 668 (1969), and a cautious, case-by-case approach is necessary to the proper development of controlling precedent. Herpich v. Wallace, 5 Cir., 1970, 430 F.2d 792. Consequently, we inquire herein whether defendants' conduct, if proved to be as plaintiffs allege, is the type of behavior which was meant to be prohibited by the section and the rule. SEC v. National Securities, 393 U.S. 453, 467, 89 S.Ct. 564, 572 (1969).

Shell and the Arizona Group argue that plaintiffs have not stated a claim under Rule 10b–5 because the complaint does not allege either (1) that members of the Alabama National board of directors were deceived in any way in connection with the corporation's purchase or sale of securities or (2) that Shell, one member of an eleven-man board, or the Group controlled the actions of a majority of the board. Unlike defendants, we find that a Rule 10b–5 claim has been stated. The complaint alleges a conspiracy between the Arizona Group and Shell to defraud Alabama National by causing the corporation directly, and indirectly through its purchase of securities, to provide the inducement to Shell to sell control of Alabama National to the Group. This inducement allegedly was cast in the form of (1) a sham employment contract that Alabama National was caused to enter with Shell and (2) a purchase by NSI of Shell's Alabama National and Capital Corporation stock —representing the power to control Alabama National—at a price in excess of the market value of this stock and its cost to Shell. Alabama National allegedly was caused to pay part of this inducement directly to Shell through the device of the long-term employment contract. It allegedly was caused to pay part of the inducement indirectly to Shell through the device of its purchase of securities and other property from NSI at excessive prices, followed by NSI's use of the money received from Alabama National to pay Shell for his stock. This behavior on the part of defendants, if proved, is of the sort that section 10(b) and Rule 10b–5 were meant to prevent.

or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

Section 3(a) (13) reads as follows:
"The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire."
These definitions apply when the terms "security," "buy," and "purchase" are used in the Exchange Act "unless the context otherwise requires." 15 U.S.C. § 78c(a).

The complaint affords defendants fair notice of what plaintiffs' claim is and the grounds upon which it rests. It does not appear beyond doubt that plaintiffs can prove no set of facts which would entitle their corporation to relief. Consequently, the District Court was correct in overruling defendants' motions to dismiss. Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); Cliff Food Stores, Inc. v. Kroger, Inc., 5 Cir., 1969, 417 F.2d 203; Pred v. Board of Public Instruction of Dade County, 5 Cir., 1969, 415 F.2d 851. Fairly read, the complaint alleges that defendants, directly or indirectly, caused at least a majority of the Alabama National board to act adversely to the interests of their corporation in connection with a securities transaction between Alabama National and NSI which was not conducted at arm's length. If proved to be as alleged, defendants' behavior violated section 10(b) and Rule 10b–5. *See* Schoenbaum v. Firstbrook, 2 Cir., 1968, 405 F.2d 215 (en banc).

As used in the complaint,[12] the term "control" is a shorthand expression of the "power to direct or cause the direction of the management and policies of a person * * *." SEC Rule 12b–2 (f), 17 C.F.R. § 240.12b–2(f). *See also* Susquehanna Corp. v. Pan American Sulphur Co., 5 Cir., 1970, 423 F.2d 1075; Berle, The Price of Power: Sale of Corporate Control, 50 Cornell L.Q. 628, 630 (1965). Taking the allegations of the complaint as true, we find that Shell possessed "control" of Alabama National until mid-January 1968. On January 19, 1968, he executed an agreement to sell his power over Alabama National to NSI and thereafter resigned as an officer and director of Alabama National. Then, on January 25, 1968, Alabama National was caused to purchase securities at an exorbitant price from NSI. NSI, having just acquired control of Alabama National from Shell, then possessed the "power to direct or cause the direction of the management" of its customer.

The question whether the transaction between Alabama National and NSI was conducted at arm's length goes to the merits of plaintiffs' case, not to the jurisdiction of the federal court or the sufficiency of the complaint to withstand a motion to dismiss for failure to state a claim.

Under the facts alleged, the Arizona Group, acting through NSI, was in a position either to govern the judgment of the Alabama National board or to conspire with Shell to govern the board's judgment in connection with Alabama National's purchase of securities and other property from NSI. Defendants' reliance on the lack of an express allegation that any Alabama National director was deceived in connection with this purchase as a ground for dismissing the complaint is not warranted. To be sure, as a general statement of corporate law, a corporation can acquire knowledge only through its officers and agents and can know only what its officers and agents know. *E. g.,* Bergeson v. Life Insurance Corporation of America, 10 Cir., 1959, 265 F.2d 227, 232; 3 Fletcher, Private Corporations § 790 (perm. ed. 1965); Restatement (Second) of Agency § 9(3) (1958). Arguably, therefore, if the corporation's officers or agents are not deceived, the corporation is not deceived, and a claim is not stated under section 10(b) and Rule 10b–5. *See* O'Neill v. Maytag, 2 Cir., 1964, 339 F.2d 764. This contention rests upon the idea that the corporation should be treated as possessing the attributes of a person. Like other concepts of the corporate business organization, however, the anthropomorphic concept of the corporation—a person capable of injury and knowledge —is not a universal solvent for problems involving corporate relationships. *See e. g.,* Andrews, The Stockholder's Right to Equal Opportunity in the Sale of Shares, 78 Harv.L.Rev. 505, 538–545 (1965). In the present context, our predominant concern is with effectuating the remedial purposes of section 10(b),

---

12. *See* note 9 *supra.*

as implemented by Rule 10b–5. SEC v. Capital Gains Research Bur., 375 U.S. 180, 195, 84 S.Ct. 275, 284–285, 11 L.Ed. 2d 237 (1963). Conceptual analysis of corporate relationships must bow to that concern. *See* Dasho v. Susquehanna Corporation, 7 Cir., 1967, 380 F.2d 262, 270 (Fairchild, J.); Ruckle v. Roto American Corporation, 2 Cir., 1964, 339 F.2d 24, 29.

Defendants' position, by allowing all liability under section 10(b) and Rule 10b–5 to be foreclosed on the basis of a finding that all the Alabama National directors knew that they were causing their corporation to pay excessive consideration for securities and other property, would remove the corporation—and hence its shareholders—from the protection of the section and the rule merely because of the ease with which defendants victimized it. The result would be to permit those dealing with a corporation to practice the basest sort of chicanery in connection with securities transactions they enter into with that corporation. They would need only to hold sway over the corporation's directors or cause them by other means to act adversely to the interests of the organization they were charged to manage. In such a situation, the corporation is deprived of the opportunity to engage in securities transactions in a "climate of fair dealing," SEC v. Capital Gains Research Bur., 375 U.S. 180, 201, 84 S.Ct. 275, 288 (1963). Vindication of the congressional purpose to establish a climate of fairness for securities transactions is required in these circumstances by the section and the rule. When a person who is dealing with a corporation in a securities transaction denies the corporation's directors access to material information known to him, the corporation is disabled from availing itself of an informed judgment on the part of its board regarding the merits of the transaction. In this situation the private right of action recognized under Rule 10b–5 is available as a remedy for the corporate disability. We can make no meaningful distinction between this situation and the one at hand. When the other party to the securities transaction controls the judgment of all the corporation's board members or conspires with them or the one controlling them to profit mutually at the expense of the corporation, the corporation is no less disabled from availing itself of an informed judgment than if the outsider had simply lied to the board. In both situations the determination of the corporation's choice of action in the transaction in question is not made as a reasonable man would make it if possessed of all the material information known to the other party to the transaction.

Under the particular circumstances of this case, therefore, we conclude that an express allegation that Alabama National directors have been deceived in connection with the corporation's purchase or sale of securities is not a necessary element of a 10b–5 claim asserted on behalf of the corporation. It suffices, for purposes of stating a claim under Rule 10b–5, that the complaint alleges that Alabama National, as a result of the conspiracy carried out by Shell and the Arizona Group, was caused to participate in a securities transaction in which it was prevented by both the other party and its own directors from taking advantage of the safeguards the disclosure requirements of the rule were meant to provide.[13]

The orders in Nos. 27447 and 27514 are affirmed.

---

13. With respect to Shell, the complaint alleges that this defendant committed acts in furtherance of the conspiracy between him and the Arizona Group. Having allegedly joined in the conspiracy and taken steps to assure its success, Shell may also be held accountable for the acts of his coconspirators in furtherance of their scheme. Dasho v. Susquehanna Corporation, 7 Cir., 1967, 380 F.2d 262, 267 n. 2. Since we have concluded that plaintiffs have stated a 10b–5 claim on behalf of Alabama National, it is not necessary for us to consider other points raised by plaintiffs on this appeal.