Milton SCHLESINGER et al., Plaintiffs,

v.

Robert H. WALLACE et al., Defendants.

Milford E. HENSLEY et al., Plaintiffs-Appellants,

v.

Jack E. LOVE et al., Defendants-Appellees.

Milford E. HENSLEY et al., Plaintiffs-Appellants,

v.

Claude E. SHELL et al., Defendants-Appellees.

No. 73–1914.

United States Court of Appeals, Fifth Circuit.

May 16, 1975.
Rehearing and Rehearing En Banc Denied July 17, 1975.

J. Vernon Patrick, Jr., A. Berkowitz, Michael L. Edwards, Birmingham, Ala., for Schlesinger.

W. Gerald Stone, Bessemer, Ala., for Bookout.

David J. Vann, pro se.

Alan W. Heldman, Birmingham, Ala., Joe H. Reynolds, Houston, Tex., Jack Crenshaw, Montgomery, Ala., for defendants-appellees.

Eugene J. Pitman, Houston, Tex., Hobart H. McWhorter, Jr., Birmingham, Ala., for Cowling.

Before GODBOLD and MORGAN, Circuit Judges, and BOOTLE, District Judge.

GODBOLD, Circuit Judge:

This appeal is by plaintiffs from a judgment for numerous defendants in consolidated shareholder derivative suits.[1] The litigation concerns intricate transactions touching two Alabama insurance companies, Alabama National Life Insurance Company and its parent Old National Insurance Company, both now in state receivership in Alabama on petition of the Alabama Superintendent of Insurance; Southern States Life Insurance Company, a Texas company; and Capital Corporation of Texas and National Securities, Inc., investment companies based, respectively, in Texas and Arizona; and numerous individual defendants from several states connected at various times with one or more of these companies. Eventually there were

---

1. In a prior appeal in one of the actions we held that a cause of action was stated under federal securities laws. Shell v. Hensley, 430 F.2d 819 (CA5, 1970).

a total of 16 defendants. The plaintiffs are individual stockholders of Alabama National Life, the Superintendent of Insurance of Alabama as receiver for Alabama National Life, and the receiver ad litem for Old National Insurance Co.

The result of the web of transactions, plaintiffs contend, was to siphon off the assets of the two Alabama insurance companies.

Following a ten-week trial the case was decided by the jury on numerous special interrogatories and a general verdict for defendants. The trial court granted plaintiffs' motion for judgment n. o. v. against one defendant, National Securities, Inc., and no appeal has been taken by that defendant. Plaintiffs' motion for new trial as to all other defendants was denied. Finding no reversible error, we affirm.

### I.

Plaintiffs contend that the trial court erroneously permitted defense counsel to refer at trial to consent judgments entered before trial against an individual defendant, Robert H. Wallace, and to various pending claims and suits by plaintiffs against persons not parties to this case (and possible insurance coverage that might be a source of recovery on some of these claims).

We condense the intricacies of the record. A few days before trial and without notice to the other defendants accused of conspiracy with him, defendant Wallace agreed, subject to approval by the court, to a settlement pursuant to which two $3,500,000 judgments, not dischargeable in bankruptcy, would be entered against him in favor of Alabama National Life and Old National, respectively, and in partial satisfaction of the judgments he would transfer assets to the receivers for Alabama National Life and Old National.[2] The settlement was pro tanto and made without prejudice to claims of plaintiffs against other defendants.

On the morning of the day set for trial a hearing was held to determine if the settlement should be approved. Some of the defendants opposed approval, urging that the form of the settlement was a sham and calculated to give the plaintiffs an unfair advantage in the trial. Some defendants had received no notice of the hearing and asked for a continuance to determine how the settlement had affected their rights. It was denied. Various defendants contended that the figure of $7,000,000 was employed as a tactical device to influence the jury venire and to give to the case the aura of liability against the defendants and in large amounts. They pointed out that the defendant Wallace, 58 years old, broke, and unemployed, had transferred in partial satisfaction of the judgments all of his assets except his exempt homestead, and, though the judgments were not dischargeable in bankruptcy, plaintiffs had agreed they would not attempt to satisfy them out of his future earnings.

During the hearing the trial judge suggested that it would be desirable to determine whether the settlement could be mentioned in the presence of the jury. He referred to another case with which counsel were familiar in which a consent settlement had been approved, and the plaintiffs therein had agreed not to mention it, and he had left it to defendants therein whether they wished to bring it up before the jury. He implicitly, if not explicitly, solicited such an agreement from the plaintiffs in this case, but it was not offered. He stated that it would be up to the defendants in this case whether they wished to present to the jury the matter of the settlement and pointed out that reference to it might redound to the benefit of defendants. Defendant Wilder specifically pointed out that he reserved the right to refer at trial to the settlement.

The court approved the settlement, and the trial began. The matter of the

---

**2.** The value of the assets is in dispute but various counsel refer to values in the neighborhood of $20,000, plus Wallace's rights in a note receivable in the face amount of $1,500,000 (the subject of litigation in another state and impliedly of dubious value).

settlement developed immediately. In his opening statement defendant Love, an attorney appearing pro se, twice remarked that Wallace had paid $7,000,000 "in form of confession of judgment." No one objected. Later, however, after opening statements on behalf of two other defendants, plaintiffs requested the court instruct the jury that the fact that a judgment had been entered did not mean it had been collected "and tell them [the jury] to disregard that." Counsel for defendant Sellers objected to going into the matter any further, and the court sustained that objection to plaintiffs' request. Counsel for plaintiffs then said, "Well, they brought it up, and I think we're entitled to go into it, Your Honor."

From then on plaintiffs and defendants were scrambling for the benefit of inferences that the jury might draw from the settlement and from plaintiffs' other suits and claims. Defendants sought to convey the inference that Wallace's concession of liability revealed him as the sole or primary person responsible for the alleged wrongdoing. Implicitly, if not explicitly, defendants attempted to convey the impression that plaintiffs would be made whole by the Wallace judgments and other pending claims and suits. From their side of the table, plaintiffs carried out with vigor their stated intention of going into the matter of the judgments. In a series of moves, counter-moves, and responsive moves occurring during several days of trial, the parties jockeyed for advantage with respect to this complex of evidentiary matters. Plaintiffs' position was neither clear nor consistent, and it shifted as the apparent immediate tactical benefit to plaintiffs appeared to move.

For instance, a defendant offered in evidence a copy of one of the Wallace judgments. Plaintiffs' counsel made a statement that the court treated as an objection and overruled, and the copy was admitted on the issue of damages. Plaintiffs' counsel then suggested that "the court handle that matter" (presumably meaning that the effect of the judgment on damages should be decided by the court and not the jury), but then went on to state that he considered he had the right to present to the jury evidence relating to the settlement.

Plaintiffs introduced evidence tending to show that recovery on the Wallace judgments would be small. They elicited testimony concerning settlements made with other individual defendants and testimony regarding other pending suits and claims asserted in behalf of Alabama National Life and Old National against others. Also the receiver of Alabama National Life testified on cross-examination, without objection by plaintiffs, to a proposed settlement with National Securities that would produce over a million dollars for the two Alabama companies and another settlement with a released defendant that relieved Alabama National Life of a contract on which its exposure was $350,000.

Arguably, with respect to the Wallace judgments, plaintiffs obtained eve-of-trial approval of the settlement subject to the court's stated intention to permit defendants to refer to it if they wished, and therefore waived objection to mention of it. But, pretermitting that point, in the continuing and ongoing context of the eve-of-trial hearing and the trial, with respect to the Wallace judgments and the other matters we have mentioned the District Judge did not abuse the discretion permitted him in evidentiary matters.

## II.

The trial judge required that the "shop book" rule, 28 U.S.C. § 1732, be satisfied as a prerequisite to introduction of corporate records as they were offered. The argument is made to us that instead the court should have admitted all of these records in bulk at the beginning of the trial. The basis for this contention is a theory that corporate records shown to be in possession of a receiver and obtained from the lawful custodian may be admitted upon that predicate alone to prove fraud against managing officers and other persons to whom

knowledge of the fraudulent character of the transactions may be fairly imputed. Plaintiffs rely upon Taylor v. United States, 96 F.2d 16 (CA5), cert. denied, 305 U.S. 596, 59 S.Ct. 78, 83 L.Ed. 377 (1938).[3] The trial court did not err in declining to follow *Taylor* here where the records did not come from a single corporate custodian but from several sources, and not all were, as in *Taylor*, identifiable by a single custodian, and the defendants included persons other than managing officers to whom knowledge of the character of transactions could fairly be imputed. Additionally the documents included informal memoranda as opposed to records kept in regular course of business.

■ Coupled with the foregoing point is an additional argument that even if the shop book rule was technically applicable the trial court's insistence that it be complied with required plaintiffs to call individual defendants as adverse witnesses, unduly prolonged the trial and inhibited plaintiffs' examination of witnesses. This complaint is addressed to the trial judge's discretion, and we see no abuse.

### III.

■ We have examined the record with respect to the claim of plaintiffs that they were denied a fair trial by reason of improper statements and suggestions directed at individual plaintiffs, the receiver-plaintiffs, plaintiffs' counsel, and plaintiffs' witnesses, made in the presence of the jury by defendant Love, an attorney who appeared pro se, and by various of the defense attorneys. Plaintiffs focus most strongly upon allegedly anti-Semitic remarks directed at the Jewish partner of plaintiffs' lead counsel. This partner participated in various pretrial matters but not in the trial itself.

This was a hotly-contested case, with unconcealed tension between some of the attorneys from discovery through appeal. Things were said in the trial court, and even in briefs on this appeal, that should not have been said—by various defense counsel (particularly by defendant Love) and by plaintiffs' counsel as well. But this is not to say that in the overall context of this ten-week trial these departures rose to the level of reversible error.

Plaintiffs raised this issue for the first time as a major point of their motion for new trial. The trial judge heard lengthy arguments on the motion and denied it by written order saying, *inter alia*:

Plaintiffs have removed from context and brought into focus from a ten weeks trial certain alleged prejudicial statements of defendant Love as a basis for a new trial as to all of the defendants. Most of these statements did not evoke any objections at the time of their utterance, and at no time were they asserted as grounds for a mistrial—actions normally calculated to alert the court to the taking of corrective measures. The omission of able and skilled counsel to take some such action could be attributed to a belief that the statements were innocuous, but if not so, to a judgment that they should take their chances on a favorable outcome notwithstanding such statements. The statements as now reflected against an unfavorable outcome are attributed a significance claimed to be so vital as to necessitate a new trial.

Without analyzing each such statement, but referring only to those charged to be anti-Semitic, the Court, with what it believes to be sensitive ears to racial overtones, did not at the time such statements were made detect any such racial overtones.

In the environment of the contest so vigorously waged for so long, the Court seriously doubts that any of the statements complained of prejudiced the jury or affected the outcome of the cases and so holds.

We could not possibly say that the distinguished and experienced trial judge was not correct in his appraisal.

Other issues either drop out of the case or do not merit discussion. In the

---

**3.** *See* United States v. Feinberg, 140 F.2d 592 (CA2), cert. denied, 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562 (1944), in which Judge Learned Hand refers to *Taylor* as "extreme."

final analysis, as the trial judge noted, this was a hard-fought case with evidence on the basis of which the jury could have found either way. The trial was not perfect but there was no reversible error. The jury verdict is in and there the case ends.

Affirmed.