**BIO–MEDICAL SCIENCES, INC., Plaintiff,**

v.

**Julia WEINSTEIN et al., Defendants.**

**No. 75 Civ. 2571.**

United States District Court,
S. D. New York.

Feb. 18, 1976.

---

**20.** *Id.* at 1283.

**21.** *Id.* at 1284.

Richard E. Burns, New York City, for plaintiff.

Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, for defendants Julia Weinstein, individually, and Julia Weinstein and Alan F. Doniger as executors, by Geoffrey M. Kalmus, New York City, of counsel.

D'Amato, Costello & Shea, New York City, for Henry H. Wolf and Wolf Popper Ross Wolf & Jones.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

In this case we must decide [1] whether plaintiff has stated a claim under SEC Rule 10b–5, and are thus called upon to discern the outer reaches of the "judicial oak which has grown from little more than a legislative acorn". *Blue Chip Stamps v. Manor Drug Stores* (1975), 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539.

Plaintiff Bio-Medical Sciences, Inc. ("Bio-Medical") a New York corporation founded in 1967 by the late Berel Weinstein and controlled by him until October 18, 1974, filed a 14-count complaint in this court, naming the following defendants: the executors of Weinstein's estate, Weinstein's widow, and certain of Bio-Medical's former attorneys. Bio-Medical originally alleged violations of 1) Section 17(a) of the Securities Act of 1933, 2) Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 and 3) the common law. After defendants brought this motion to dismiss the complaint in its entirety, Bio-Medical consented to dismissal of all of the counts based on the 1933 Act, por-

---

**1.** To accommodate the parties' need for a speedy determination, the "decision" and order dismissing the complaint was announced and filed on January 12, 1976, subject to a later publication of an opinion.

tions of the counts based on 10(b) and 10b–5, and one of the counts based on state law. Left for our consideration is the legal sufficiency of the remaining 10b–5 claims and the pendent state claims.

In the interest of brevity and clarity, we will describe in detail only those facts alleged by plaintiff which are relevant to the 10b–5 claims still being pursued. The facts supporting the pendent claims of breach of fiduciary duty [2] would become pertinent only if we were to determine that the 10b–5 claims are valid.

Berel Weinstein founded Bio-Medical in 1967 primarily for the purpose of developing and manufacturing a disposable thermometer for sale to hospitals and the general public. Until late in 1974 he served as president, chief executive officer and chairman of the board. Weinstein was active in all aspects of the company's operations, being the principal capital raiser, contract negotiator, public relations director and manager.

In 1969 Bio-Medical raised approximately $2 million through a public offering of its stock. In 1971 it sold $5 million of 6% convertible subordinated notes (the 1971 notes) to four institutional investors. In the spring of 1972, needing more capital to sustain operations which were still in the developmental stage, Weinstein initiated negotiations with a larger group of institutional investors. At the time of these negotiations, Bio-Medical had already entered into a valuable distribution contract with Johnson & Johnson, and several other firms had expressed some interest in its product. However Weinstein—not content with relying upon this legitimate good news— vastly exaggerated the interest displayed by these other firms, suggested that some of them were actually investing in Bio-Medical, and on at least one occasion buttressed his claims by concocting a fraudulent letter on the letterhead of one of these firms. In so doing Weinstein acted entirely on his own, and without the knowledge or complicity of the board of directors. As a result of his efforts Bio-Medical in the fall of 1972 concluded a $25 million [3] sale of 6½% convertible subordinated notes (the 1972 notes).

In July 1974 the company was in dire financial straits, and Weinstein commenced negotiation with the holders of the 1972 notes for additional capital or other concessions. In the midst of those negotiations, Weinstein's fraud was uncovered. The noteholders, together with certain of Bio-Medical's directors, presented the facts of Weinstein's fraud to the SEC. Subsequently the SEC filed a complaint in this court against both the corporation and Weinstein personally,[4] alleging violations of Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act.[5] Without admitting or denying liability, Bio-Medical and Weinstein consented to the entry of a consent judgment. Among other things, this judgment enjoined Weinstein from serving as

2. These claims include the accusation that the attorneys who represented both the corporation and Weinstein personally should have detected the fraud earlier and that in fact they helped Weinstein prevent detection.

3. According to the terms of the Note Agreement, $10 million from the sale was placed in trust to be held by an independent trustee until Bio-Medical showed gross profits of $1 million from sales of its disposable thermometer in any consecutive period of six months prior to July 1, 1974. These conditions were not met.

4. SEC v. Bio-Medical Sciences, Inc., Berel Weinstein and Zsigmond L. Sagi (75 Civ. 226

T.P.G.) Mr. Sagi was a vice president and director of Bio-Medical who was accused of assisting Weinstein in his fraudulent endeavors.

5. The SEC complained of other fraud by Weinstein not here relevant. The most serious accusation was that in 1974 Weinstein deliberately falsified the results of a test of Bio-Medical's ability to mass produce and package the disposable thermometer. A sample which he showed to Johnson & Johnson as having been manufactured mechanically was in fact partially produced by hand. As a result the investing public was misled about Bio-Medical's true manufacturing capacity.

director or executive officer of Bio-Medical.

Still in urgent need of capital, the newly elected executive entered into negotiations with the holders of all the company's notes—the fraud-free 1971 notes as well as the tainted 1972 notes. With respect to the holders of 1972 notes, the company's objective was to obtain the waiver of rescission rights to which they believed Weinstein's fraud entitled them.

The renegotiation was successful, but Bio-Medical made valuable concessions to the noteholders. These included: payment of attorneys' fees with respect to all legal proceedings arising out of the fraud, restrictions on the corporation's working capital, and limitations on its ability to pay dividends or to purchase its own stock. In addition, the noteholders secured valuable conversion rights, which many of them exercised thus diluting the value of the company's capital stock.

It is the company's claim that this dilution of its stock and all the other disadvantages just mentioned resulted from Weinstein's fraudulent misrepresentations relating to the sale of 1972 notes, and that a 10b–5 claim against Weinstein is thus established. For reasons that follow, we disagree with this conclusion.

Discussion:

Our analysis must begin with a consideration of the recent major Supreme Court pronouncement concerning Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores, supra.* Although the holding itself is irrelevant to the problem at hand, the opinions seem to indicate a

reluctance to expand the ambit of 10b–5 liability. We read the majority as well as the concurring opinions as a judicial indication that the "judicial oak" should be trimmed back rather than force-fed.

There can be no doubt that Weinstein's conduct with respect to the sale of 1972 notes gave rise to various violations of the securities laws. What is not so clear is that such conduct gave rise to a 10b–5 claim by Bio-Medical against Weinstein.[6]

■ If the allegations of the complaint are deemed to be true, Weinstein's fraudulent conduct ultimately resulted in loss to the corporation. The question is: was that loss suffered "in connection with" the sale of the 1972 notes? We think not. It is possible to construe the "in connection with" requirement of Rule 10b–5 as meaning that any fraud by any officer of an issuer having any relationship to any sale by the issuer is actionable by such issuer. It is equally possible to construe the "in connection with" requirement as meaning that in order for the issuer to be able to sue its own officers or directors under 10b–5 it must be able to show that loss resulted from the sale itself. It seems to us that the latter construction is more consistent with the spirit of *Blue Chip.* Moreover, as far as we can determine it is consistent with every decided case on the subject. See *e. g., International Controls Corp. v. Vesco* (2d Cir. 1974) 490 F.2d 1334, *cert. den.* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236; *Ruckle v. Roto American Corp.* (2d Cir. 1964) 339 F.2d 24; *Shell v. Hensley* (5th Cir. 1970) 430 F.2d 819; *Hooper v. Mountain States Securities Corp.* (5th Cir. 1960) 282 F.2d 195; *Hoover v. Allen*

---

**6.** Rule 10b–5 provides as follows:

"§ 240.10b–5 Employment of manipulative and deceptive devices.

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."

(S.D.N.Y.1965) 241 F.Supp. 213; *Kane v. Central American Mining & Oil, Inc.* (S.D.N.Y.1964) 235 F.Supp. 559; *New Park Mining Co. v. Cranmer* (S.D.N.Y. 1963) 225 F.Supp. 261.

In *Vesco*, for example, a 10b–5 claim by an issuer was sustained on an allegation that the issuer had been induced by defendant directors improvidently to dispose of some of its stock holdings by way of a dividend in kind. The Court of Appeals wrestled with the problem of whether such a dividend in kind could be deemed a "sale". Having answered that question in the affirmative, the Court had no trouble in holding that defendants would be liable on a showing that the issuer had received inadequate consideration for the assets it had thus been induced to "sell". On the other hand in *Hoover v. Allen, supra*—a case involving the *purchase* of its own stock by a corporation at an artificially *depressed* price—the court found no 10b–5 violation because the corporation could not have been injured by the purchase itself, despite an allegation that the defendants' motive for depressing the price had been to assist them in a fraudulent scheme of manipulating corporate control.

■ The facts in this case illustrate the wisdom of thus limiting the "in connection with" concept. In all cases where liability was sustained, the officers or directors being sued were essentially trying to use the purchase or sale to benefit themselves or others at the expense of the corporation. Here, the opposite is true. Weinstein, albeit by improper means and for the conceded purpose of benefiting himself, was seeking to achieve such benefit solely by enhancing the assets of the corporation and thus increasing the value of its shares. Had he succeeded, all other stockholders would have benefitted as much as he did. Indeed, he did succeed in enhancing those assets, if only temporarily. Consequently, it would be most difficult to assess damages. In determining the damages in cases when 10b–5 claims

were recognized the courts were faced with the simple problem of computing the harm resulting from the sale (or purchase) i. e. how much did the corporation get (or give) as opposed to how much should it have gotten (or given). Here, on the other hand, we would have to embark on a far-ranging inquiry, starting with the threshold question of whether the corporation could have survived at all but for the 1972 sale of notes. Such questions, it seems to us, are more appropriately relegated to courts exercising conventional equity jurisdiction.

■ Because we are dismissing plaintiff's claims arising under the federal securities laws, we also dismiss the pendent state claims as more properly litigated in state court.[7]

Parties to submit judgment on notice.

---

7. There is no basis for diversity jurisdiction between Bio-Medical and any of the defendants.