David GOLDBERG, suing derivatively in right and for the benefit of Universal Gas & Oil Company, Inc., Plaintiff-Appellant,

v.

Yaacov MERIDOR, Mila Brener, David Meridor, S. Erell, Gideon Ben Aaron, Ara A. Cambere, H. Struve Hensel, Haim Rafaeli, Martin Siem, Jacob Sutton, Henry A. Singer, Maritimecor, S.A., Maritime Fruit Carriers Company, Ltd., Hornblower & Weeks, Hemphill Noyes, Inc., Laventhol & Horwath a/k/a Laventhol Krekstein, Horwath & Horwath, Dr. Jacobo Damm, Dr. Max Lebedkin, Elie Housman, H. L. Federman, William J. Friedman, Merril M. Halpern, Per Hy-Sing-Dahl, Andre Montell, Fritz Konig, Zev Levin, Raymond Caliezi, Defendants-Appellees,

and

Universal Gas & Oil Company, Inc., Nominal Defendant.

No. 1289, Docket 77–7146.

United States Court of Appeals, Second Circuit.

Argued June 9, 1977.

Decided Sept. 8, 1977.

As Modified on Denial of Rehearing Oct. 21, 1977.

Morton J. Turchin, New York City (Turchin & Topper, and James H. O'Hare, New York City, of counsel), for plaintiff-appellant.

William Rand, Jr., Thomas J. Kane, and Andrew Berger, New York City, for defendants-appellees.

Coudert Brothers, New York City, of counsel, for defendant-appellee H. Struve Hensel.

Cichanowicz & Callan, and Michael G. Chalos, New York City, of counsel, for defendants-appellees David Meridor, S. Erell, Gideon Ben Aaron, Haim, Rafaeli, Jacob Sutton, Maritimecor, S.A., and Maritime Fruit Carriers Co. Ltd.

Wender, Murase & White, and Peter J. Gartland, New York City, of counsel, for Universal Gas & Oil Co. Inc.

Willkie, Farr & Gallagher, and Armando T. Belly, New York City, of counsel, for defendants-appellees Yaacov Meridor and Mila Brener.

Singer, Hutner, Levine & Seeman, Jay W. Seeman, and Robert J. Kaplan, New York City, of counsel, for defendant-appellee Henry A. Singer.

Mudge, Rose, Guthrie & Alexander, and Laurence V. Senn, Jr., New York City, of counsel, for defendant-appellee Ara A. Cambere.

Before FRIENDLY, TIMBERS and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

In this derivative action in the District Court for the Southern District of New York, David Goldberg, a stockholder of Universal Gas & Oil Company, Inc. (UGO), a Panama corporation having its principal place of business in New York City, sought to recover damages and to obtain other relief against UGO's controlling parent, Maritimecor, S.A., also a Panama corporation; Maritimecor's controlling parent, Maritime Fruit Carriers Company Ltd., an Israel corporation; a number of individuals who were directors of one or more of these companies; the investment firm of Hornblower & Weeks, Hemphill, Noyes, Inc.; and the accounting firm of Laventhal & Horwath, with respect to transactions which culminated in an agreement providing for UGO's issuance to Maritimecor of up to 4,200,000 shares of UGO stock and its assumption of all of Maritimecor's liabilities (including a debt of $7,000,000 owed to UGO) in consideration of the transfer of all of Maritimecor's assets (except 2,800,000 UGO shares already held by Maritimecor). It suffices at this point to say that the complaint, filed February 3, 1976, alleged that the contract was grossly unfair to UGO and violated both § 10(b) of the Securities Exchange Act and the SEC's Rule 10b–5 and common law fiduciary duties. By notice of motion filed June 2, 1976, the nominal defendant UGO moved for a stay pending plaintiff's posting security for expenses and costs under § 627 of the N.Y. Business Corporation Law. By order filed July 30, 1976, the district court ruled that following receipt of UGO's shareholder list, Goldberg was required either to meet the exemptions from posting security under § 627, post the security otherwise required in an amount to be determined, or "amend his complaint in this action to eliminate any and all claims based on or arising out of state common law or state statutory law."

Goldberg chose the latter course. The amended complaint, filed August 27, 1976, which was largely repetitive of the original complaint save for the omission of reference to state law claims, made the following principal allegations: The defendants engaged in "a conspiracy or plan" "to cause UGO to raise funds from the public by a public offering and then by various transactions hereafter set forth, including the transfer of UGO stock to Maritimecor for the latter's assets and liabilities, use the proceeds of the offering and the assets of UGO for the benefit of defendants Maritimecor and Maritime Fruit." In May 1972 defendants caused UGO to issue a prospectus offering for sale 11,000 units consisting of 363,000 shares of common stock and $11,000,000 worth of 8% convertible debentures. The prospectus stated that all the proceeds of the offering would be used to finance the construction and purchase of three tankers for the transportation of liquified gas and that UGO's business would be the transportation of such gas. In 1974 defendants caused UGO to sell the contracts for two of the vessels, for a total price of $25,000,000 of which $14,000,000 was profit. During 1974 and up to August 1975, defendants caused UGO to make loans to Maritimecor so that $7,000,000 was owed by the latter. In August 1975 defendants caused UGO to enter into the agreement described in the first paragraph of this opinion, which was later carried out at least to the extent of the transfer of Maritimecor's assets and liabilities to UGO. The "agreement and transfer was fraudulent and unfair in that the assets of Maritimecor were overpriced and of insufficient value, the liabilities of Maritimecor either exceeded the value of its assets or were so great that the net asset value was insufficient consideration, the liabilities included a $7,000,000 debt to UGO from Maritimecor, and the purpose and intent of said transaction was to cause the dissipation of the substantial assets of UGO for the benefit of defendants, Maritimecor and Maritime Fruit. [T]he defendants .   .

knew at the time, or had reasonable cause to know and were negligent in not ascertaining that the agreement and transfer were a fraud and unfair to UGO, and that the net value of the assets of Maritimecor was far less than the value of the shares of UGO to be issued to Maritimecor, or that Maritimecor's liabilities exceeded its assets." Then came paragraph 19, which alleged as follows:

The issuance of the aforesaid prospectus and the foregoing transactions constituted the employment of a device, scheme or artifice to defraud, the making of untrue statements of material fact and the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and the engaging in acts, practices, and courses of conduct which operated as a fraud or deceit upon UGO as the seller of up to 4,200,000 shares of UGO's common stock for Maritimecor's liabilities and assets, and upon UGO's minority stockholders.

Defendants filed motions to dismiss the amended complaint for failure to state a claim under § 10(b) of the Securities Exchange Act and Rule 10b–5. In answer to defendants' argument "that deception and non-disclosure is a requirement for a 10b–5 case" which was disputed as a matter of law, plaintiff's counsel submitted an affidavit asserting that "insofar as plaintiff Goldberg, a minority shareholder is concerned, there has been no disclosure to him of the fraudulent nature of the transfer of Maritimecor assets and liabilities for stock of UGO". Counsel annexed two press releases dated August 1 and December 19, 1975, which described the agreement for and the consummation of the UGO-Maritimecor transaction. Counsel asserted that these press releases failed to disclose the facts noted in the margin[1] or "the conflicts of interest of the principals".[2] Counsel requested that he be given leave to replead should the court find any defect in the manner of pleading. In a further affidavit addressed to the question of damage, counsel averred that at the end of 1974 UGO had current assets of about $41 million and current liabilities of $2 million but that after the transfer Maritimecor's net current liabilities of $42.5 million caused UGO to wind up with a deficit of about $3.6 million of current liabilities. He also alleged that as a result of the transaction UGO had defaulted in its obligations and its ships were being seized by creditors.

On February 11, 1977, Judge Lasker filed an opinion, 426 F.Supp. 1059, that granted the motions to dismiss. He thought the case was governed by *Popkin v. Bishop*, 464 F.2d 714 (2 Cir. 1972), rather than by our *en banc* decisions in *Schoenbaum v. Firstbrook*, 405 F.2d 215 (2 Cir. 1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), and *Drachman v. Harvey*, 453 F.2d 722 (2 Cir. 1972), and held that *Marshel v. AFW Fabric Corp.*, 533 F.2d 1277 (2 Cir.), *vacated and remanded for consideration of mootness*, 429 U.S. 881, 97 S.Ct. 228, 50 L.Ed.2d 162 (1976), and *Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283 (2 Cir.), which was pending before the Supreme

---

1. Maritimecor, as of the end of fiscal year 1974 had current liabilities of $42.5 million dollars, and in addition Maritimecor owed UGO about $7 million dollars which apparently was being forgiven in the transaction. The shareholders' net equity in Maritimecor was $40.4 million dollars or substantially less than its current liabilities. Further, included in the assets of Maritimecor are 2.8 million shares of UGO, the value of which are substantially decreased as a result of this transaction.

2. In fact both press releases did state that Maritimecor was UGO's "parent" and the first recounted that on consummation of the transaction Maritimecor ownership of UGO common stock "will increase from 2,800,000 (78 percent) to 7,000,000 (90 percent)" while "[a]n additional 500,000 shares and 289,100 shares of UGO common stock are now held—and will continue to be held—by a subsidiary of Panmaritime Limited S.A., a Panama corporation which controls [Maritime Fruit], and the public, respectively."

Both releases also concluded with a statement that "UGO's common stock and 8 percent Convertible Subordinated Debentures are traded over-the-counter (NASDAQ–UGOLF and UGOLZ, respectively)."

Court on grant of certiorari, 429 U.S. 814, 97 S.Ct. 54, 50 L.Ed.2d 74 (1976), were limited to the situation of "going private". He denied leave to amend, as hereafter discussed. After the reversal of *Green*, 462 U.S. 430, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the judge filed a memorandum adding to the opinion fn. 4 to the effect that the Supreme Court's decision rendered his analysis of our decision moot but lent substantial support to the result.

## I.

■ Before proceeding further, we must deal with the district court's refusal to permit amendment of the complaint to include reference to the two press releases or otherwise to claim deception. The judge's explanation of this was as follows, 426 F.Supp. at 1064:

> There have already been two complaints. . . . Both are prime examples of an attempt to fit the square peg of a state law claim into the round hole of a 10b–5 allegation. When the original complaint was dismissed for failure to post security or obtain the requisite support from other minority shareholders, Goldberg was made exquisitely aware of the need to limit this amended pleading to a federal claim, unless he could post security under state law, which he could not. Although he now contends that he could allege that [he] was deceived by the defendants with regard to the terms of the transaction with Maritimecor, he chose to frame the amended complaint in such a way as to exclude this element altogether. There is a limit to the time and energy a federal court should accord to marginal federal causes of action which are fully capable of being vindicated in state court. Presumably, if the element of deceit formed any significant aspect of Goldberg's claim, or was responsible for the alleged injury to UGO, Goldberg could have been expected to have plead such facts before the third go-round.

The third sentence conveys a rather misleading impression as to the court's earlier ruling. The court had offered Goldberg a choice between complying with New York Business Corporation Law § 627 or dropping any reference to state claims. When Goldberg chose to do the latter, nothing had yet been said by the defendants or the judge concerning the alleged inadequacy of his pleading of the federal claim. Goldberg had indeed been made "exquisitely aware" that he must drop his state claim if he wished to avoid compliance with § 627 of the New York Corporation Law, but not at all that he had failed to plead a federal claim through insufficient reference to deception. In every real sense when Goldberg requested further leave to amend he thus was seeking a second round, not a third. If Goldberg's counsel had been earlier made aware of the alleged deficiency in his complaint, it would have been easy for him to include in his first amended complaint reference to the press releases and the contrast between their complacent tone and the grim actualities asserted in counsel's affidavit on damage and also to include the fact, which had already surfaced in discovery, that one of UGO's directors, Martin Siem, claimed that he had been deceived or at least had not been fully informed with regard to the Maritimecor transaction. When counsel requested leave to replead, no answers had yet been filed. Contrast *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1085–1087 (2 Cir., 1977). The considerations explicated in *Schoenbaum, supra,* 405 F.2d at 218, as to the undesirability of granting summary judgment to defendants in a stockholder's derivative suit before discovery has been completed, see also 6 *J. Moore, Federal Practice* ¶ 56.17[60], at 56–1065 (1976 ed.), dictate liberality in allowing such complaints to be amended to reflect facts already discovered. We are therefore constrained to hold that the refusal of leave to amend was an abuse of discretion and to treat the cases as if an amendment, at least in the two respects noted, had been allowed.

## II.

If the complaint were thus amended, we would deem it clear that, so far as this

court's decisions are concerned, the case would be governed by *Schoenbaum* rather than by *Popkin*.[3] The August 1 press release held out an inviting picture that

> As a result of the transaction, UGO will replace Maritimecor as the principal operating subsidiary of MFC and, as such, will engage in a diversified line of shipping and shipping related activities including the sale of ships and ship-building contracts, the operation of reefers and tankers, and upon their delivery, product carriers and oil drilling rigs, and underwriting marine insurance.[4]

when allegedly the truth was that UGO had entered into a transaction that would ensure its doom. *Popkin* was specifically rested on its special facts. The plaintiff was taken to have conceded that the complaint did not allege misrepresentation or non-disclosure and that he relied solely on the unfairness of the merger terms, see 464 F.2d at 718 & n. 9, 720. The opinion expressly noted that "[u]nquestionably this court has recognized that the Rule 10b–5 reaches beyond traditional stock transactions and into the board rooms of corporations" and that "assertions by a defendant that the misconduct complained of 'really' amounts to 'just' corporate mismanagement will not cut off a plaintiff's federal remedy." 464 F.2d at 718. The court likewise quoted with approval, 464 F.2d at 719, Judge Hays' statement in dissenting from the panel opinion in *Schoenbaum*,

> In order to establish fraud it is surely not necessary to show that the directors deceived themselves. It must be enough to show that they deceived the shareholders, the real owners of the property with which the directors were dealing. Deception of the shareholders (with the exception of the majority stockholder which was a party to the transactions) is established by showing that the directors withheld from them information that would

have revealed the true value of the treasury stock.

and the statement in his opinion for the *en banc* court in that case,

> Moreover, Aquitaine and the directors of Banff were guilty of deceiving the stockholders of Banff (other than Aquitaine). (Footnote omitted.)

The observation in *Popkin*, 464 F.2d at 719, that "our emphasis on improper self-dealing did not eliminate nondisclosure as a key issue in the Rule 10b–5 cases" followed a statement that when, as here, state law does not demand prior shareholder approval of a transaction, "it makes sense to concentrate on the impropriety of the conduct itself rather than on the 'failure to disclose' it because full and fair disclosure in a real sense will rarely occur. It will be equally rare in the legal sense once the view is taken—as we did in *Schoenbaum*—that under federal securities law disclosure to interested insiders does not prevent a valid claim that fraud was committed upon 'outsiders' (such as minority shareholders) whatever the requirements of state corporate law may be." *Id.* The ruling of *Popkin* was that in the *opposite* situation, where "merger transactions . . ., under state law, must be subjected to shareholder approval . . . if federal law ensures that shareholder approval is fairly sought and freely given, the principal federal interest is at an end," 464 F.2d at 720, see also *id.* n.17. Clearly that is not this case. Cf. *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 598 n.27 (5 Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

### III.

The ruling that this case is attracted by *Schoenbaum* rather than by *Popkin* by no means ends our inquiry. Rather it brings us to the serious question whether *Schoenbaum* can be here applied consistently with

---

**3.** We do not mean this to imply agreement with the district court's contrary conclusion with respect to the first amended complaint. It is simply unnecessary to decide this.

Plaintiff does not contend that the allegations with respect to the May 1972 prospectus are

sufficient to support the complaint; any injury from misleading statements in the prospectus would be to the purchasers, not to the corporation on whose behalf this action was brought.

**4.** The December 19 press release contained a similar statement.

the Supreme Court's decision in *Santa Fe Industries, Inc. v. Green, supra.* We think it can be and should.

■ Before we address ourselves directly to the *Green* opinion, it will be useful to review the development of the law on the application of § 10(b) and Rule 10b–5 to derivative actions. There can be no doubt that the Securities Exchange Act "protects corporations as well as individuals who are sellers of security" and that it is irrelevant that "the transaction is not conducted through a securities exchange or an organized over-the-counter market." *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 10–11, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971). The Court there quoted with approval the language in *Hooper v. Mountain States Securities Corp.,* 282 F.2d 195, 203 (5 Cir. 1960), *cert. denied,* 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961),

> Considering the purpose of this legislation, it would be unrealistic to say that a corporation having the capacity to acquire $700,000 worth of assets for its 700,-000 shares of stock has suffered no loss if what it gave up was $700,000 but what it got was zero.

and made the oft-quoted pronouncement, 404 U.S. at 12, 92 S.Ct. at 168, paraphrasing its earlier decision as to construction of the anti-fraud provision of the Investment Advisers Act of 1940, see *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), that

> Section 10(b) must be read flexibly, not technically and restrictively.

■ The problem with the application of § 10(b) and Rule 10b–5 to derivative actions has lain in the degree to which the knowledge of officers and directors must be attributed to the corporation, thereby negating the element of deception. Our first important encounter with this problem was in *Ruckle v. Roto American Corp.,* 339 F.2d 24 (2 Cir. 1964). We rejected the attribution, saying 339 F.2d at 29:

> We come then to the question whether it is possible within the meaning of Section 10(b) and Rule 10B–5 for a corporation to be defrauded by a majority of its directors. We note at the outset that in other contexts, such as embezzlement and conflict of interest, a majority or even the entire board of directors may be held to have defrauded their corporation. When it is practical as well as just to do so, courts have experienced no difficulty in rejecting such cliches as the directors constitute the corporation and a corporation, like any other person, cannot defraud itself.
>
> If, in this case, the board defrauded the corporation into issuing shares either to its members or others, we can think of no reason to say that redress under Rule 10B–5 is precluded, though it would have been available had anyone else committed the fraud. There can be no more effective way to emasculate the policies of the federal securities laws than to deny relief solely because a fraud was committed by a director rather than by an outsider. Denial of relief on this basis would surely undercut the congressional determination to prevent the public distribution of worthless securities.

Although it was there claimed that certain directors withheld information from others, the above quoted passage indicated in dictum that not only the majority but even the entire board, fully informed, could be held to have defrauded the corporation if they all had an interest in a transaction adverse to it. Less than a month later, however, another panel declined to follow the *Ruckle* dictum. *O'Neill v. Maytag,* 339 F.2d 764, 767 (2 Cir. 1964).

The future, both in this circuit and in others, lay with the *Ruckle* dictum rather than with *O'Neill. Dasho v. Susquehanna Corp.,* 380 F.2d 262, 270 (7 Cir.) ("concurring" opinion), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967), refused to "differentiate between situations where the directors were unanimous in wrongdoing and those where less than all were involved." In *Pappas v. Moss,* 393 F.2d 865, 869 (3 Cir. 1968), the court said in rejecting defendants' claim that "the corporation was not deceived" in issuing stock to insiders and others at a low price because "all of its

agents (directors) here were aware of the true facts":

> if a "deception" is required in the present context, it is fairly found by viewing this fraud as though the "independent" stockholders were standing in the place of the defrauded corporate entity at the time the original resolution authorizing the stock sales was passed. . . . Certainly the deception of the independent stockholders is no less real because, "formalistically", the corporate entity was the victim of the fraud.

Dealing with the argument that there must be either affirmative misrepresentation to stockholders or the misleading of a minority of the directors, Judge Seitz wrote, 393 F.2d at 869–70:

> We think these references as to their position indicate that their construction of Rule 10b–5 is untenable. It exalts form over substance. Indeed, it seems to suggest that there is an inverse relationship between the application of the Rule and the number of directors participating in a fraud on its corporation. Finally, it restricts the application of the Rule in a way which is at odds with its basic purpose. See *McClure v. Borne Chem. Co.*, 292 F.2d 824 (3rd Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).[5]

We cited *Pappas* with approval in the *en banc* opinion in *Schoenbaum*, 405 F.2d at 220,

> Moreover, Aquitaine and the directors of Banff were guilty of deceiving the stockholders of Banff (other than Aquitaine).

See *Pappas v. Moss*, 393 F.2d 865 (3d Cir. 1968).

thereby effectively overruling any requirement of *O'Neill* that there must be one virtuous or ignorant lamb among the directors in order for liability to arise under § 10(b) or Rule 10b–5 on a deception theory as to securities transactions with a controlling stockholder.[6] See *Jennings & Marsh, Securities Regulation* 998–99 (1977). See also *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 865 n.1 (2 Cir. 1968) (Friendly, J., concurring), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

We followed *Schoenbaum* in *Drachman v. Harvey*, 453 F.2d 722, 736 (2 Cir. 1972) (*en banc*), although in that case not all the directors were parties to the fraud, and in *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2 Cir. 1974), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). *Schoenbaum* has been generally applauded by commentators, even though it may sometimes have been read to mean more than it does or than is needed to call for a reversal here. See, e.g., Bloomenthal, *From Birnbaum to Schoenbaum: The Exchange Act and Self-Aggrandizement*, 15 N.Y.L.F. 332 (1969) (making the perceptive suggestion that "it is inconceivable that a court which in *Texas Gulf Sulphur* [401 F.2d 833 (2 Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)] emphasized the disclosure purposes of the Exchange Act could have reached any different result in *Schoenbaum*"); Folk, *Corporation Law Developments—1969*, 56 Va.L.

---

**5.** Although recognizing that *Pappas* considered deception of minority shareholders to be sufficient, defendants would distinguish the case on the ground of the existence of misrepresentations in the minutes of the directors' meeting authorizing the sale of the stock and in proxy material issued to obtain stockholder ratification which the court had found ineffective apart from this. See 393 F.2d at 870, 868. But this clearly was not the *ratio decidendi* of *Pappas*.

**6.** Even the majority panel opinion in *Schoenbaum* recognized that, 405 F.2d at 211,

> knowledge of the corporation's officers and agents is not imputed to it when there is a conflict between the interests of the officers

and agents and the interests of the corporate principal. . . . Therefore, a corporation may be defrauded in a stock transaction even when all of its directors know all of the material facts, if the conflict between the interests of one or more of the directors and the interest of the corporation prevents effective transmission of material information to the corporation, in violation of Rule 10b–5(2). (Footnote omitted.)

though it thought that director knowledge did negate corporate deception "[s]ince the directors were all fully informed and since only the non-interested directors participated in the vote authorizing the sale", 405 F.2d at 212.

Rev. 755, 805–12 (1970); Comment, *Schoenbaum v. Firstbrook: The "New Fraud" Expands Federal Corporation Law,* 55 Va.L.Rev. 1103 (1969); Note, *The Controlling Influence Standard in Rule 10b–5 Corporate Mismanagement Cases,* 86 Harv. L.Rev. 1007 (1973); Note, *Schlick v. Penn-Dixie Cement Corp.: Fraudulent Mismanagement Independent of Misrepresentation or Nondisclosure Violates Rule 10b–5,* 63 Calif.L.Rev. 563 (1975); 41 Ford.L.Rev. 742 (1973); see also Bahlman, *Rule 10b–5: The Case for its Full Acceptance as Federal Corporation Law,* 37 U.Cinn.L.Rev. 727, 735–36 (1968) (criticizing the panel opinion in *Schoenbaum*); but see Note, *Civil Liability Under Section 10B and Rule 10B–5: A Suggestion for Replacing the Doctrine of Privity,* 74 Yale L.J. 658, 681–82 (1965); Comment, 47 N.Y.U.L.Rev. 1279 (1972). It likewise is viewed with approval—indeed seemingly would be adopted—by §§ 1303 and 1402(c) of the proposed ALI Federal Securities Code, Tent. Draft No. 2 (March 1973) and revised comments in Reporter's Revision of Text of Tentative Drafts Nos. 1–3, pp. 104–06 (Oct. 1, 1974), see also §§ 234D(c) and 1301. It has also found favor in other circuits. A notable instance is *Shell v. Hensley,* 430 F.2d 819, 827 (5 Cir. 1970), where the court in a derivative suit rejected a claim that no "causal deceit" existed when the corporation's board knew all the facts, saying:

> When the other party to the securities transaction controls the judgment of all the corporation's board members or conspires with them or the one controlling them to profit mutually at the expense of the corporation, the corporation is no less disabled from availing itself of an informed judgment than if the outsider had simply lied to the board. In both situations, the determination of the corporation's choice of action in the transaction in question is not made as a reasonable man would make it if possessed of the material information known to the other party to the transaction.[7]

See also *Rekant v. Desser,* 425 F.2d 872, 879–82 (5 Cir. 1970); *Jannes v. Microwave Communications, Inc.,* 461 F.2d 525, 529 (7 Cir. 1972); *Bailey v. Meister Brau, Inc.,* 535 F.2d 982, 993 (7 Cir. 1976); 1 *Bromberg, Securities Law: Fraud* §§ 4.7(544)–(545) (collecting cases and noting, at pp. 84.51–84.52 that "[m]ost courts have now modified their views of deception to accommodate . . . (1) informational deception of a non-decision-maker who has a role or economic interest (minority director, shareholder, or creditor) or (2) non-informational deception measured by economic injury (to the company of other parties with real economic interest) equivalent to that resulting from informational deception of decision makers").

*Schoenbaum,* then, can rest solidly on the now widely recognized ground that there is deception of the corporation (in effect, of its minority shareholders) when the corporation is influenced by its controlling shareholder to engage in a transaction adverse to the corporation's interests (in effect, the minority shareholders' interests) and there is nondisclosure or misleading disclosures as to the material facts of the transaction. Assuming that, in light of the decision in *Green,* the existence of "controlling influence" and "wholly inadequate consideration"—an aspect of the *Schoenbaum* decision that perhaps attracted more attention, see 405 F.2d at 219–20—can no longer alone form the basis for Rule 10b–5 liability, we

---

**7.** See *Superintendent of Insurance, supra,* 404 U.S. 6, at 12–13, 92 S.Ct. 165, at 169, where the Court quoted the *Shell* court's description of a situation thought to be indistinguishable from the one faced in *Shell*:

> The crux of the present case is that [the corporation] suffered an injury as a result of deceptive practices touching its sale of securities as an investor. As stated in *Shell v. Hensley,* 430 F.2d 819, 827:

> "When a person who is dealing with a corporation in a securities transaction denies the corporation's directors access to material information known to him, the corporation is disabled from availing itself of an informed judgment on the part of its board regarding the merits of the transaction. In this situation the private right of action recognized under Rule 10b–5 is available as a remedy for the corporate disability." (Footnote omitted.)

do not read *Green* as ruling that no action lies under Rule 10b–5 when a controlling corporation causes a partly owned subsidiary to sell its securities to the parent in a fraudulent transaction and fails to make a disclosure or, as can be alleged here, makes a misleading disclosure. The Supreme Court noted in *Green* that the court of appeals "did not disturb the District Court's conclusion that the complaint did not allege a material misrepresentation or nondisclosure with respect to the value of the stock" of Kirby; the Court's quarrel was with this court's holding that "neither misrepresentation nor nondisclosure was a necessary element of a Rule 10b–5 action", 430 U.S. at 470, 97 S.Ct. at 1299, and that a breach of fiduciary duty would alone suffice, see fn. 8. It was because "the complaint failed to allege a material misrepresentation or material failure to disclose" that the Court found "inapposite the cases [including *Schoenbaum*] relied upon by respondents and the court below, in which the breaches of fiduciary duty held violative of Rule 10b–5 included some element of deception", 430 U.S. at 475, 97 S.Ct. at 1301, see fn. 15. While appellant is wrong in saying that the Court "approved" these cases, there is no indication that the Court would have casually overturned such an impressive and unanimous body of decisions by courts of appeals. To the contrary, the Court used rather benign language about them, saying that they "forcefully reflect the principle that '[s]ection 10(b) must be read flexibly not restrictively' and that the statute provides a cause of action for any plaintiff who 'suffer[s] an injury as a result of deceptive practices touching its sale [or purchase] of securities . . .,'" citing the *Superintendent of Insurance* case, *supra*, 404 U.S. at 12–13, 92 S.Ct. 165. Mr. Justice White simply distinguished these cases as not supporting the position we had taken in *Green*, namely, "that a breach of fiduciary duty by majority stockholders, *without any decep-*

*tion, misrepresentation, or nondisclosure,* violates the statute and the Rule." (Emphasis supplied.)

█ Here the complaint alleged "deceit . . . upon UGO's minority shareholders" and, if amendment had been allowed as it should have been, would have alleged misrepresentation as to the UGO–Maritimecor transaction at least in the sense of failure to state material facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," Rule 10b–5(b).[8] The nub of the matter is that the conduct attacked in *Green* did not violate the " 'fundamental purpose' of the Act as implementing a 'philosophy of full disclosure' ", 430 U.S. at 478, 97 S.Ct. at 1303; the conduct here attacked does.

Defendants contend that even if all this is true, the failure to make a public disclosure or even the making of a misleading disclosure would have no effect, since no action by stockholders to approve the UGO–Maritimecor transaction was required. Along the same lines our brother Meskill invoking the opinion in *Green*, 430 U.S. at 474 n.14, 97 S.Ct. at 1301 n.14, contends that the defendants' acts were not material since plaintiff has failed adequately to allege what would have been done had he known the truth.

In *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976), a case arising under Rule 14a–9, the Court laid down the standard of materiality as "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder" or, putting the matter in another way, "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information

---

**8.** We do not mean to suggest that § 10(b) or Rule 10b–5 requires insiders to characterize conflict of interest transactions with pejorative nouns or adjectives. However, if Maritimecor was in the parlous financial condition alleged in the opposing affidavit of plaintiff's counsel, a disclosure of the acquisition of Maritimecor that omitted these *facts* would be seriously misleading.

made available." When, as in a derivative action, the deception is alleged to have been practiced on the corporation, even though all the directors were parties to it, the test must be whether the facts that were not disclosed or were misleadingly disclosed to the shareholders "would have assumed actual significance in the deliberations" of reasonable and disinterested directors or created "a substantial likelihood" that such directors would have considered the "total mix" of information available to have been "significantly altered." That was the basis for liability in *Schoenbaum*; it was likely that a reasonable director of Banff, knowing the facts as to the oil discovery that had been withheld from minority shareholders, would not have voted to issue the shares to Aquitaine at a price below their true value. This also is the principle recognized in the passage from Judge Ainsworth's opinion in *Smith v. Hensley, supra*, 430 F.2d at 827, quoted above. Here there is surely a significant likelihood that if a reasonable director of UGO had known the facts alleged by plaintiff rather than the barebones of the press releases, he would not have voted for the transaction with Maritimecor.

Beyond this Goldberg and other minority shareholders would not have been without remedy if the alleged facts had been disclosed. The doubts entertained by our brother as to the existence of injunctive remedies in New York, see footnotes 7 and 9 and accompanying text, are unfounded. *Blumenthal v. Roosevelt Hotel, Inc.*, 202 Misc. 988, 115 N.Y.S.2d 52 (Sup.Ct.N.Y.Co. 1952), and *Williams v. Bartell*, 34 Misc.2d 552, 226 N.Y.S.2d 187 (Sup.Ct.N.Y.Co.), *modified*, 16 A.D.2d 21, 225 N.Y.S.2d 351 (1st Dept. 1962), were suits by stockholders acting in their own behalf to enjoin the sale of all corporate assets or a merger transaction as to which New York afforded dissenters the remedy of an appraisal. While the appraisal remedy was not exclusive, the existence of that remedy was held to require a plaintiff seeking an injunction to demonstrate a strong balance of equities in his favor. The UGO–Maritimecor transaction was not of the sort that would afford UGO's stockholders any right of appraisal.

Where an appraisal remedy is not available, the courts of New York have displayed no hesitancy in granting injunctive relief, *see e. g., Robinson v. New York & P. C. R. Co.*, 123 App.Div. 339, 108 N.Y.S. 91 (1st Dept. 1908) (enjoining transfer of assets); *Levy v. Pacific Eastern Corp.*, 153 Misc. 488, 492, 275 N.Y.S. 291, 298 (Sup.Ct.N.Y.Co.1934) ("As a court of equity will afford appropriate relief after the event, it will also act to prevent any threatened injury by the exercise of its plenary and exclusive jurisdiction over the trust relation."); *Silverman v. Lehrman*, 25 Misc.2d 339, 203 N.Y.S.2d 171 (Sup.Ct. Kings Co.1960) (enjoining transaction between subsidiary and parent); *Rebell v. Muscat*, 26 App.Div.2d 685, 272 N.Y.S.2d 478 (2d Dept. 1966) (enjoining directors-majority stockholders from granting themselves stock options and bonuses). See also *Kavanaugh v. Kavanaugh Knitting Co.*, 226 N.Y. 185, 196, 123 N.E. 148, 152 (1919) ("A court of equity will protect a minority stockholder against the acts or threatened acts of the board of directors or of the managing stockholders of the corporation, which violate the fiduciary relation and are directly injurious to the stockholders."); *Gordon v. Elliman*, 306 N.Y. 456, 462, 119 N.E.2d 331, 335 (1954) (when equitable power is brought to bear, "the object is for the court to chart the course for the corporation which the directors should have selected, and which it is presumed they would have chosen if they had not been actuated by fraud or bad faith."), *accord, Koral v. Savory, Inc.*, 276 N.Y. 215, 219, 11 N.E.2d 883, 845 (1937). The dissent also fails to take account of the liberalization of New York law by the Business Corporation Law, effective September 1, 1963. Section 720 of that statute provides:

(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

   \*    \*    \*    \*    \*    \*

(3) To enjoin a proposed unlawful conveyance, assignment, or transfer of corporate assets, where there is sufficient evidence that it will be made.

(b) An action may be brought for the relief provided in this section, and in paragraph (a) of section 719 (Liability of directors in certain cases) by a corporation, or a receiver, trustee in bankruptcy, officer, director or judgment creditor thereof, or, under section 626 (Shareholders' derivative action brought in the right of the corporation to procure a judgment in its favor), by a shareholder, voting trust certificate holder, or the owner of a beneficial interest in shares thereof.

As Judge (now Chief Judge) Breitel has written, "The statute is broad and covers every form of waste of assets and violation of duty whether as a result of intention, negligence, or predatory acquisition," *Rapoport v. Schneider*, 29 N.Y.2d 396, 400, 328 N.Y.S.2d 431, 435, 278 N.E.2d 642, 645 (1972). Under the 1963 statute there can also be no question as to the applicability of these remedies to UGO. Section 1317 of the Business Corporation Law provides:

(a) Except as otherwise provided in this chapter, the directors and officers of a foreign corporation doing business in this state are subject, to the same extent as directors and officers of a domestic corporation, to the provisions of:

\*　　\*　　\*　　\*　　\*　　\*

(2) Section 720 (Action against directors and officers for misconduct.)

(b) Any liability imposed by paragraph (a) may be enforced in, and such relief granted by, the courts of this state, in the same manner as in the case of a domestic corporation.

Apart from this and the provisions of § 1319 of the Business Corporation Law, defendants have not brought to our attention any Panamanian law similar to the Venezuelan prohibition against derivative actions that concerned the court in *Haus-*

*man v. Buckley*, 299 F.2d 696 (2d Cir.), cert. denied, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962).

The availability of injunctive relief if the defendants had not lulled the minority stockholders of UGO into security by a deceptive disclosure, as they allegedly did, is in sharp contrast to *Green*, where the disclosure following the merger transaction was full and fair, and, as to the pre-merger period, respondents accepted "the conclusion of both courts below that under Delaware law they could not have enjoined the merger because an appraisal proceeding is their sole remedy in the Delaware courts for any alleged unfairness in the terms of the merger," fn. 14. Indeed, we have quite recently recognized that the availability of an injunctive action under New York law constituted a sufficient basis for distinguishing the conclusion in the *Green* footnote with respect to materiality, *SEC v. Parklane Hosiery Co., Inc.*, 558 F.2d 1083, 1088 (2 Cir. 1977). While our brother Meskill is correct in stating that *Parklane* was an enforcement action by the SEC, we do not perceive why the test of materiality should be any different; indeed this court's seminal statement with respect to materiality was made in a SEC enforcement action, *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848–52 (2 Cir. 1968), cert. denied sub nom. *Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), and contained no intimation that a stricter test would be applied in a private action.[9]

Defendants also rely on statements in Part IV of the *Green* opinion which lend them some support if taken in isolation and out of context. Thus the Court, quoting from *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 40, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), said that one factor in determining whether a case was covered by § 10(b) and

---

**9.** The dissent's reliance on *Fershtman v. Schectman*, 450 F.2d 1357 (2 Cir. 1971), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972), is misplaced. The limited partners who were the plaintiffs in that case were seeking rights greater than afforded by the partnership agreement on the basis of a "clarifying" letter from the defendants' attorney. Our holding was not that the difference between the letter and the agreement was not material, but that plaintiffs had not been deprived of any rights arising from the letter which they might have under state law. Here the nondisclosure or misleading disclosure allegedly deprived the corporation of proper action by its directors and the plaintiffs of an opportunity to bring a derivative action on behalf of UGO to enjoin the transaction with Maritimecor.

Rule 10b–5, was "whether "the cause of action [is] one traditionally relegated to state law . . . .' " But the Court quickly added, after referring to the Delaware appraisal statute, that "Of course, the existence of a particular state law remedy is not dispositive of the question whether Congress meant to provide a similar federal remedy," and it would be hard to think of a cause of action more "traditionally relegated to state law" than the one asserted in the *Superintendent of Insurance* case, which, as has been said, made "just plain stealing" a fraud under Rule 10b–5, on the basis that Begole failed to tell the directors "in advance that he was going to steal", *Jennings & Marsh, Securities Regulation* 997–98 (1977). Defendants rely also on the Court's fears of the difficulty of future line-drawing among various kinds of breach of fiduciary duty involving securities transactions. But this was said in support of drawing the line so as to require plaintiffs to make claims of nondisclosure or misleading disclosure, not as directing the lower courts to dismiss cases where it was claimed that fiduciaries had failed to disclose their self-dealing or had made a misleading disclosure, even though no disclosure was required by state law.[10] Similarly we fail to see how defendants gain from the Court's quotation of its statement in the *Superintendent of Insurance* case, 404 U.S. at 12, 92 S.Ct. at 169, that "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement"—a statement that originally seemed intended only to remove *negligent* corporate misconduct from the reach of the statute. We readily agree that if all that was here alleged was that UGO had been injured by "internal corporate mismanagement", no federal claim would have been stated. But a parent's looting of a subsidiary with securities outstanding in the hands of the public in a securities transaction is a different matter; in such cases disclosure or at least the absence of misleading disclosure is required. It would be incongruous if Rule 10b–5 created liability for a casual "tip" in the bar of a country club, as we held in *SEC v. Geon Industries, Inc.*, 531 F.2d 39 (2 Cir. 1976), but would not cover a parent's undisclosed or misleadingly disclosed sale of its overvalued assets for stock of a controlled subsidiary with securities in the hands of the public.

The order dismissing the complaint is reversed and the case is remanded to the district court for further proceedings, including amendment of the complaint, consistent with this opinion.[11]

MESKILL, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I and II of Judge Friendly's opinion, for I agree that the district judge should have allowed amendment

---

10. We need not now decide whether, as some commentators have suggested, in certain self-dealing situations disclosure of the fact that the transaction is to occur or has occurred is required by federal law—whether as an affirmative duty on the corporation in some circumstances to disclose under Rule 10b–5 even in the absence of its trading, *Jacobs, The Impact of Rule 10b–5* § 88.04[a] (rev.ed.1977); *see, e. g., SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 850 & n. 12 (2 Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *SEC v. North American Research & Development Corp.*, 424 F.2d 63, 79 n. 13 (2 Cir. 1970); *Financial Indus. Fund, Inc. v. McDonnell Douglas Corp.*, 474 F.2d 514 (10 Cir. 1973); *Securities Act Release No. 5092* (Oct. 15, 1970), and other sources cited in *Jacobs, supra; compare Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 949 (2 Cir. 1969), or as a requirement of applicable specific reporting provisions under the 1934 Act, *see, e. g.,* §§ 13 and 15(d); Form 10–K (Items 1 and 15); Form 8–K (Item 2), or as an obligation imposed by a national securities exchange, *see, e. g., NYSE Company Manual* A–18; *AMEX Company Guide; see also* Exchange Act Rule 15c2–11.

11. It should be apparent that we decide only that the complaint, with the amendment we have considered as if allowed, states a claim. Of course, we intimate no opinion concerning the factual correctness of any allegation nor do we mean to prejudice consideration of any legal issues possibly relevant to this case but not raised on this appeal. Thus, for example, we need not pass on whether any deception of director Siem might suffice as the requisite deception. See 1 *Bromberg, Securities Law: Fraud,* § 4.7(543), at 84.57 (1973) (stating that "[i]t is not clear whether full disclosure at a board meeting permits a claim of deception of a director who is absent").

of the complaint[1] and that a corporation may be defrauded by some or all of its directors. I part company, however, with the majority's holding that the complaint, as "amended" in the manner suggested by Judge Friendly, to include the press releases, states a cause of action. Assuming that any deception of the minority shareholders took place, the complaint nevertheless fails to establish that the claimed deception was "material."[2] Accordingly, I respectfully dissent from the discussion in Part III of the majority opinion concerning materiality and the impact of *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

The test of materiality in securities law has recently been laid out by the Supreme Court. In *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), which dealt with an alleged omission under Rule 14a–9, Justice Marshall stated:

> The general standard of materiality that we think best comports with the policies of Rule 14a–9 is as follows: An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills'* general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial

likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2133 (footnote omitted). *See Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1302 (2d Cir. 1973); *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965) ("The basic test of 'materiality,' on the other hand, is whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.' ").[3]

Under Panamanian law, no shareholder action was necessary to effect the UGO–Maritimecor merger. Accordingly, the burden is on the plaintiffs to demonstrate a substantial likelihood that they would have acted differently had full disclosure been made.[4]

For example, in *Fershtman v. Schectman*, 450 F.2d 1357 (2d Cir. 1971), we dealt with a

---

1. The allegation of deception was clearly insufficient under Fed.R.Civ.P. 9(b), which requires specificity in pleading fraud. *See Segan v. Dreyfus Corp.*, 513 F.2d 695 (2d Cir. 1975). This deficiency is understandable in view of appellant's stout insistence, throughout the district court proceedings, that 10b–5 had expanded to a point where an allegation of deception was no longer required. His principal support for this contention was our decisions in *Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283 (2d Cir. 1976) and *Marshel v. AFW Fabric Corp.*, 533 F.2d 1277 (2d Cir. 1976). At that point, fraudulent deception was merely a make-weight. Following the Supreme Court reversal in *Green*, appellant shifted his emphasis on appeal, and recast his case to center on the alleged deception.

2. As the majority concedes, the directors were under no obligation to denounce their own proposal, no matter how malign their intent.

Thus, the omitted "facts" upon which the amended complaint is based are the failure to include the actual amount of Maritimecor's assets and liabilities in the press release and a false representation that the transaction would inure to the benefit of UGO. While these are probably sufficient to survive a motion to dismiss, they amount to little more than that. The information on Maritimecor was almost undoubtedly in the hands of the public through its annual reports and filings with the SEC.

3. The test of materiality under 14a–9 and 10b–5 is the same. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Gilbert v. Nixon*, 429 F.2d 348, 355 (10th Cir. 1970).

4. The majority's heavy reliance on our *en banc* opinion in *Schoenbaum v. Firstbrook*, 405 F.2d 215 (2d Cir. 1968), *cert. denied*, 395 U.S. 906,

"forced sale" of limited partnership interests made under the partnership agreement. The general partners were given the sole power to make this decision. The limited partners brought suit, claiming that a number of misleading statements and nondisclosures were made concerning the termination. The Court held that these allegations, even if true, did not meet the requirement of materiality:

> [I]f defendants were legally entitled to terminate the partnership on March 31, 1968, in their sole discretion, it would make no difference what they misrepresented or concealed, even if we assume in plaintiff's favor that this transaction constituted a sale.

*Id.* at 1360.[5]

Although the majority asserts that state remedies were available to halt the merger, the explanation of what they were is unpersuasive. The principal action suggested by the majority opinion is an injunction[6] against the proposed merger. The theory is apparently that the shareholders, who were led down the primrose path by the misleading press releases, would have raced into court if armed with the full story. It is possible that plaintiffs could have obtained an injunction under New York's Martin Act, N.Y.Gen.Bus.Law § 352 *et seq.* (McKinney 1976). *See American Bank & Trust Co. v. Barad Shaff Securities Corp.*, 335 F.Supp. 1276 (S.D.N.Y. 1972).[7] In order to prove materiality under this theory, Goldberg will have to demonstrate that he would, as a reasonable stockholder, have sought and obtained an injunction against the proposed action had the facts not been concealed.[8] *See Herzfeld v. Laventhal, Krekstein, Horwath & Horwath*, 378

89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), is misplaced for two reasons. First, materiality was not discussed in *Schoenbaum*, since the district court had granted summary judgment on another issue. Second, *Schoenbaum* held that a breach of fiduciary duty, there the issuance of stock for inadequate consideration, was actionable under clause (3) of Rule 10b–5. *Id.* at 219–20. This holding has been overruled by *Green.*

**5.** While it is true that *Fershtman* relies in part on the panel opinion in *Drachman v. Harvey*, 453 F.2d 722 (2d Cir. 1971), *rev'd*, 453 F.2d 736 (2d Cir. 1972) (*en banc*), that aspect of the holding was not disturbed by the *en banc* Court. Moreover, *Schoenbaum v. Firstbrook* had already been decided at the time.

*Fershtman* is apposite on another ground. The Court held there that a state remedy, reformation of the partnership agreement, was available. Presumably, full disclosure would have aided the plaintiffs in state court. However, the existence of this state remedy was not deemed relevant to the existence of the federal cause of action.

**6.** In our recent decision in *S.E.C. v. Parklane Hosiery Co.*, 558 F.2d 1083 (2d Cir. 1977), we held that the availability of a state injunction was relevant in deciding materiality in an SEC enforcement action. The Court carefully distinguished that case from a private action for damages. *Id.* at 1087–88. While the majority contends that this distinction is unimportant, *Parklane* holds to the contrary.

**7.** The availability of an injunction, rather than damages, in a private action under the Martin

Act is unclear. *See People v. Concord Fabrics, Inc.*, 83 Misc.2d 120, 371 N.Y.S.2d 550, 553 (Sup.Ct. N.Y.County 1975), *aff'd*, 50 A.D.2d 787, 377 N.Y.S.2d 84 (1st Dept. 1976). An injunctive action is usually brought by the State Attorney General. However, a nondisclosure to the stockholders which might have prompted the Attorney General to sue cannot possibly give Goldberg a cause of action.

A second possibility is a lawsuit to enjoin the transaction as a breach of the statutory fiduciary obligation imposed on majority shareholders. *See* N.Y.B.C.L. § 720 (McKinney 1963). Here again, the right to enjoin the alleged misconduct here is unclear. *Compare Blumenthal v. Roosevelt Hotel, Inc.*, 202 Misc. 988, 115 N.Y.S.2d 52 (Sup.Ct. N.Y.County 1952) (Breitel, J.), *with Williams v. Bartell*, 34 Misc.2d 552, 226 N.Y.S.2d 187 (Sup.Ct. N.Y.County), *modified*, 16 A.D.2d 21, 225 N.Y.S.2d 351 (1st Dept. 1962). Thus, the claim for relief depends on uncertain aspects of state law. This underscores the correctness of Judge Lasker's holding that the federal interest was slight, if it existed at all.

The majority may be correct concerning the availability of injunctive relief in the state court. That is not the issue, however. The plaintiffs have not even alluded to the element of materiality, which is their burden to establish. Our Court should not carry that burden for them.

**8.** Given the alacrity with which actions taken by controlling shareholders are challenged in federal court, one can easily envision a suit seeking an injunction on the grounds that full disclosure would have led the plaintiff to seek an injunction.

F.Supp. 112 (S.D.N.Y. 1974), *mod. on other grounds*, 540 F.2d 27 (2d Cir. 1976).

Moreover, the plaintiff fails even to mention in his two complaints what course of action he contemplated taking. Under *Green*, such an allegation is required to state a claim under 10b–5. There, as here, a plaintiff who sought to recover in federal court for a breach of fiduciary duty appended a conclusory allegation of deception. The Court stated:

> In addition to their principal argument that the complaint alleges a fraud under clauses (a) and (c) of Rule 10b–5, respondents also argue that the complaint alleges nondisclosure and misrepresentation in violation of clause (b) of the Rule. Their major contention in this respect is that the majority stockholder's failure to give the minority advance notice of the merger was a material nondisclosure, even though the Delaware short-form merger statute does not require such notice. Brief for Respondents at 27. *But respondents do not indicate how they might have acted differently had they had prior notice of the merger.* Indeed, they accept the conclusion of both courts below

that under Delaware law they could not have enjoined the merger because an appraisal proceeding is their sole remedy in the Delaware courts for any alleged unfairness in the terms of the merger. Thus the failure to give advance notice was not a material nondisclosure within the meaning of the statute or the Rule.

430 U.S. at 474 n.14, 97 S.Ct. at 1301 n.14 (emphasis added) (citation omitted). I do not understand the remand to have relieved the plaintiff of his burden of pleading and proving the availability of state relief.[9]

The majority suggests two other bases for a finding of materiality. The first is the artificial maintenance of the price of UGO stock through nondisclosure. While this would be relevant in an action brought by the SEC or a plaintiff suing in his individual capacity,[10] I fail to see what relevance this has in a derivative action. In his representative capacity, Goldberg may assert only the rights of UGO. It is self-evident that the artificial maintenance of a high price for its stock in no way injured UGO.[11]

---

**9.** According to defendants' papers, UGO is a Panamanian corporation with principal offices in New York and Bermuda, and Maritimecor is a Panamanian corporation with its principal place of business in Zurich, Switzerland. Apparently, all but two of the defendants live outside of the United States and are citizens of foreign countries. While New York's fiduciary standards will be applied in such an action for damages, *see German-American Coffee Co. v. Diehl*, 216 N.Y. 57, 109 N.E. 875 (1915) (Cardozo, *J.*), it is not at all clear that New York law determines the availability of an injunction in this situation in spite of the provisions of § 1317 of the General Business Law. *See Hausman v. Buckley*, 299 F.2d 696 (2d Cir.), *cert. denied*, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962). *See* Reese & Kaufman, The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit, 58 Colum.L.Rev. 1118 (1958); Loss, The Conflict of Laws and the Blue Sky Laws, 71 Harv. L.Rev. 209 (1957); Currie, The Constitution and Choice of Law, 26 U.Chi.L.Rev. 9 (1958). Thus, in *Green*, the Supreme Court looked only to the availability of an injunction in Delaware, the state of incorporation. Neither the majority nor the plaintiff discusses this difficult choice-of-law issue. This unsettled question of state law may prove dispositive on the question

of materiality. Moreover, if New York would grant an injunction and other states would not, the majority will have created a federal right, the existence of which depends on the venue of the suit brought to enforce it. On the other hand, if the availability of an injunction in New York determines the issue of materiality for every federal court, then the New York Legislature will have set the standard under Rule 10b–5 for the nation.

**10.** An individual suit by Goldberg under 10b–5 would appear to founder on the purchaser-seller requirement of *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

**11.** To the contrary, the high price of UGO stock would appear to be a benefit to the corporation. Furthermore, it is hardly fitting for Goldberg to seek equitable remedies on the ground that, properly informed, he could have unloaded his stock on some unsuspecting third party. Of course, if Goldberg told the truth to the prospective purchaser, a sale was unlikely. Very few, except those interested in purchasing stockholder suits, would be willing to invest in a company after the controlling shareholders have announced an intention to loot it.

The final suggested rationale of the majority is the "chastening effect" of full disclosure. The apparent theory is that those about to loot a corporation can be shamed into honesty through a requirement that they reveal their nefarious purposes.[12]

Even the high-water mark of expansion for 10b–5, *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), acknowledged that breaches of fiduciary obligation were governed by state, and not federal, law. *Id.* at 12, 92 S.Ct. 165. The primary role of the states in these matters has been emphasized in a number of recent opinions of the Supreme Court. *See, e. g., Green, supra,* at 462, 97 S.Ct. 1292; *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

Those who breach their fiduciary duties seldom disclose their intentions ahead of time. Yet under the majority's reasoning the failure to inform stockholders of a proposed defalcation gives rise to a cause of action under 10b–5. Thus, the majority has neatly undone the holdings of *Green, Piper* and *Cort* by creating a federal cause of action for a breach of fiduciary duty that will apply in all cases, save for those rare instances where the fiduciary denounces himself in advance.

If the defendants have looted UGO in the manner alleged by the plaintiffs, a full recovery should not be difficult to obtain. Under New York state law, this would be a breach of the fiduciary duty imposed upon directors. My dissent is not based upon any desire to insulate such business practices from legal redress, but upon the fact that the plaintiff has chosen the wrong forum.

It is also noteworthy that, following a practice we have "unreservedly condemn[ed]," *Rosenfeld v. Black,* 445 F.2d 1337, 1341 n.5 (2d Cir. 1971), *cert. dismissed under Rule 60,* 409 U.S. 802, 93 S.Ct. 24, 34

L.Ed.2d 62 (1972), Goldberg has filed a parallel action on behalf of UGO in New York State Supreme Court. This only serves to reinforce what I have sought to demonstrate, namely, that this complaint sounds entirely in state law. There can be no doubt that the State Supreme Court has wide experience in corporate matters similar to this, and can afford complete relief if Goldberg's allegations are borne out at trial. Accordingly, I would remand with instructions to allow an amendment to the complaint.

---

**12.** Such a disclosure would be material, since every jurisdiction would enjoin such conduct. If the majority is merely referring to the "chastening effect" of factual disclosure to shareholders who can do nothing to stop the proposed action, lack of materiality is still a barrier under Rule 10b–5.